PINE BLUFFS AREA PROPERTY OWNERS ASSOCIATION, INC v
DeWITT LANDING AND DOCK ASSOCIATION

Docket No. 289200. Submitted March 9, 2010, at Lansing. Decided April
1, 2010, at 9:00 a.m.

The Pine Bluffs Area Property Owners Association, Inc., brought
an action in the Roscommon Circuit Court, Michael J. Baum-
gartner, J., against the DeWitt Landing and Dock Association
(DLDA) and others, alleging that defendants were improperly
using a 20-foot by 120-foot strip of property at the west end of
Hitchcock Avenue along the shore of Higgins Lake in Gerrish
Township, Roscommon County. The Roscommon County Road
Commission was added as a third-party defendant. Plaintiff
moved for summary disposition, arguing that the property in
question, the northern 20 feet of Hitchcock Avenue, was dedi-
cated to the public for use as a road through common-law
dedication. The trial court granted partial summary disposition,
finding that questions of fact existed regarding whether the
20-foot strip constituted a road, but also ordering that the
20-foot strip could no longer be used for nontemporary mooring
of watercraft or to erect nontemporary mooring structures on
the bottom of Higgins Lake, including boat hoists and wet
anchors. While setting forth its findings of fact on the record,
the trial court indicated an apparent belief that the 20-foot strip
was part of Hitchcock Avenue pursuant to a statutory dedica-
tion and that the dedication was never removed when the plat
involved was later vacated. The trial court concluded that the
20-foot strip was accepted as a road pursuant to a resolution
passed by the road commission. The trial court determined that,
because the 20-foot strip was part of Hitchcock Avenue, the
20-foot strip was subject to the same restrictions regarding its
use as those set forth in *Jacobs v Lyon Twp (After Remand)*, 199
Mich App 667 (1993). Some of the defendants appealed.

The Court of Appeals *held*:

1. There is no evidence that the road commission accepted the
streets and alleys depicted in the Kenwood plat that were dedi-
cated to the public before the plat was vacated in 1909. The
property owner who requested vacation of the Kenwood plat

requested vacation of the streets and alleys and the trial court granted the request. Absent evidence to the contrary, the vacation of the plat constitutes an affirmative act to withdraw the offer of dedication. The trial court clearly erred by concluding that the dedication of the streets and alleys in the Kenwood plat was not withdrawn when the plat was vacated, before the county made any attempt to accept the streets and alleys. Any alleged attempt by the county to accept dedication of the streets and alleys over 25 years after the plat was vacated was not timely.

2. The evidence does not establish that the decision of the owners of the property that contained the 20-foot strip to not convey the 20-foot strip when they sold the adjoining property in 1931 showed their intent to offer the 20-foot strip for public use as a road.

3. The trial court erred by determining that the evidence established that the 20-foot strip had been used as a road for at least seven years before the 1931 sale of the adjoining property. The trial court erred when it determined that the 20-foot strip was a public road through a common-law dedication.

4. The evidence does not establish that the 20-foot strip is a road pursuant to the highway-by-user statute, MCL 221.20, because there is no evidence that the road was used and worked on by public authorities.

5. The case must be remanded to the trial court to consider the issue whether the DLDA has an adverse possession claim or a prescriptive easement over the 20-foot strip.

6. It was premature for the trial court to prohibit the DLDA from placing boat hoists in the water or mooring boats. On remand, a determination must be made regarding the DLDA's interest in the 20-foot strip and then the DLDA's right to place boat hoists or moor boats may be considered.

7. On remand, the trial court must address whether any of defendants' alleged activities on the 20-foot strip constitute a nuisance.

Reversed and remanded.

1. Highways — Dedication — Public Use — Acceptance.

A valid statutory dedication of land for a public purpose requires two elements: a recorded plat designating the areas for public use, showing a clear intent by the plat proprietor to dedicate those areas to public use, and acceptance by the proper public authority; public acceptance must be timely and disclosed through a manifest act by the public authority either formally confirming or accepting

the dedication, or by exercising authority over the designated areas in some of the ordinary ways of improvement or regulation.

2. Highways — Dedication — Public Use — Acceptance.

The mere certification of a plat does not constitute acceptance by the proper public authority of all the property in the plat dedicated to public use; acceptance by a governmental authority of a road dedicated to the public must be by a formal resolution or informally through the expenditure of public money for repair, improvement, or control of the roadway, or through public use.

3. Highways — Dedication — Public Use — Acceptance — Withdrawal of Dedication.

Timely acceptance by a governmental authority of land in a recorded plat dedicated for a public purpose must take place before the offer lapses or the property owner withdraws the offer; an offer of dedication is withdrawn when the property owner undertakes an affirmative act to withdraw the offer, such as using the property in a manner that is inconsistent with public ownership; the vacation of the plat constitutes an affirmative act to withdraw the offer of dedication absent evidence to the contrary.

4. Highways — Dedication — Common Law — Public Use.

A valid common-law dedication of land for a public purpose requires an intent by the property owner to offer the land for a public use, an acceptance of the offer by public officials and maintenance of the land by public officials, and use by the public generally; a common-law dedication need not be formal and dedication may occur without a grant or even written words.

5. Highways — Highway-by-User Doctrine.

A plaintiff, to establish a public road pursuant to the highway-by-user statute, must establish: a defined line, that the road was used and worked on by public authorities, public travel and use for 10 consecutive years without interruption, and open, notorious, and exclusive public use (MCL 221.20).

*Carey & Jaskowski, P.L.L.C.* (by *Richard J. Jaskowski*), for the Pine Bluffs Area Property Owners Association, Inc.

*Olson, Bzdok & Howard, P.C.* (by *Christopher M. Bzdok* and *Jeffrey L. Jocks*), for the DeWitt Landing and Dock Association, Kenneth Shinsky, and Eric Wegner.

*Cummings, McClorey, Davis & Acho, P.L.C.* (by *Haider A. Kazim* and *Andrew J. Brege*), for the Roscommon County Road Commission.

Before: OWENS, P.J., and SAWYER and O'CONNELL, JJ.

O'CONNELL, J. This case involves a dispute regarding the use of and property rights attached to a 20-foot by 120-foot strip of property at the end of Hitchcock Avenue along Higgins Lake in Gerrish Township, Roscommon County. After a bench trial, the trial court determined that the disputed strip of property was part of Hitchcock Avenue and, therefore, subject to the same restrictions regarding its use as those set forth in *Jacobs v Lyon Twp (After Remand)*, 199 Mich App 667; 502 NW2d 382 (1993). We reverse and remand for further proceedings.

### I. FACTS AND PROCEDURAL HISTORY

#### A. OVERVIEW AND DESCRIPTION OF THE SITE

The property in dispute is a 20-by-120-foot strip of land along the shore of Higgins Lake. Both plaintiff and the Roscommon County Road Commission claim that Hitchcock Avenue is 50 feet wide at this point, while defendants claim that the property in dispute is not part of Hitchcock Avenue, so Hitchcock Avenue is only 30 feet wide at this point. The northern 20 feet of Hitchcock Avenue are located in Section 9 of Township 24 North, Range 3 West, in Gerrish Township, while the southern 30 feet are located in Section 16, Township 24 North, Range 3 West in Gerrish Township. Accordingly, the road straddles the section line as it runs in an east-to-west direction.

Hitchcock Avenue dead-ends near the shore of Higgins Lake. In particular, the 50-foot-wide paved public roadway ends approximately 120 feet east of the shore of Higgins Lake. The 120-foot by 50-foot parcel of property west of the Hitchcock Avenue terminus, known as DeWitt's Landing, has long been used by property owners in the area (specifically, "back-lotters") and by the public as an access site for Higgins Lake. Because the road commission did not appear to maintain this parcel of land, area residents created the DeWitt Landing Association and the DeWitt Dock Association to maintain the property and a public seasonal dock on the site.[1]

Photographs of the site taken in 2006 indicate that Hitchcock Avenue is paved to approximately the eastern edge of DeWitt's Landing. On approximately the southern half of the property (corresponding to the portion of the property in Township Section 16), a paved cement boat ramp leads to the water.[2] The northern portion of the property (corresponding to the portion of the property in Township Section 9) consists of a mowed grassy area, a concrete retaining wall and patio, and a beach. In particular, a mowed grassy area is located on the easternmost two-thirds of the northern portion of the property. The mowed area ends at a low concrete retaining wall, located approximately two-thirds of the way down the strip of property toward the water. Past the retaining wall is a paved area, that is wide enough for two picnic

---

[1] Historically, the membership of and actions undertaken by these organizations were largely interchangeable, and eventually the DeWitt Landing Association and the DeWitt Dock Association merged to form the DeWitt Landing and Dock Association (DLDA). Accordingly, we will refer to these three organizations as the DLDA throughout this opinion.

[2] According to one area resident, vehicles only traveled west of the guardrail when using the boat ramp to launch or pick up boats.

tables, and a sandy beach leading to the water. At the northern edge of the property, a long dock stretches out into the water. Fences stretch to the water line to both the north and south of the property.

The photographs also show that a vehicle guardrail is located at the eastern edge of DeWitt's Landing, stretching along the northern half of the eastern boundary of the property. The guardrail is approximately 20 feet long, and it separates the roadway from the grassy area to the west. A "Road Ends" sign and a red diamond-shaped sign are posted immediately behind the guardrail. Another photograph depicts a sign posted by the DLDA on the property, which reads in part, "No tax dollars are spent on upkeep of this road end. Our volunteer organization keeps the dock, beach, ramp and grassy hill in a safe and sanitary condition for the public to enjoy." (Emphasis in original.)

### B. THE 30-FOOT STRIP

The southern 30 feet of DeWitt's Landing (the 30-foot strip) is located in Section 16 of Gerrish Township and is part of the platted community of Pine Bluffs. The Pine Bluffs plat indicates that the northernmost 30 feet of the platted property, stretching approximately 400 feet from Higgins Lake to Pine Bluffs Road, was originally identified as "North Street." The westernmost 120 feet of "North Street" corresponds to the 30-foot strip. This plat dedicated the streets shown on the plat "to the use of the public."

Although the 30-foot strip was never used as a road per se, it has been used for some time to provide access for vehicles moving boats in and out of the water. Over half a century ago, DLDA members installed a cement boat ramp on the 30-foot strip, and over the years they have continued to maintain the boat ramp on behalf of

the public.[3] Apparently both DLDA members and the public have used this area consistently as a lake access point.

In separate litigation in the late 1990s, the Roscommon Circuit Court determined that the 30-foot strip was a platted road dedicated to the public and, accordingly, it limited certain shore activities on the 30-foot strip, precluded the erection of private docks, boat hoists, and other anchorage devices, and permitted the erection and maintenance of one common public dock. The use of the 30-foot strip is not in dispute in this case.

### C. PROPERTY TRANSFERS INVOLVING THE 20-FOOT STRIP

Specifically, this case concerns the use and ownership of the northern 20-by-120 feet of DeWitt's Landing (the 20-foot strip). All parties acknowledge that this property is not located within the plat of Pine Bluffs, but is adjacent to the northern boundary of the plat. Unlike the 30-foot strip, which appears to consist primarily of the boat ramp, the 20-foot strip functions more as a small park. The underlying dispute in this case concerns whether this 20-foot strip is a public road and, therefore, whether the use restrictions that apply to the 30-foot strip also apply to the 20-foot strip.

At the turn of the 20th century, the land north of the Pine Bluffs plat, including the 20-foot strip, was also platted. This plat, known as the Kenwood plat, was dedicated and registered in 1901.[4] The platters designed

---

[3] Several members of the DLDA maintained that they did not recall the county road commission or any other governmental entity performing roadwork or maintenance on the 30-foot strip. Instead, the DLDA performed all maintenance on the 30-foot strip, including maintenance of the public boat ramp, with the consent and permission of the county road commission.

[4] The plat consisted of the following land:

the Kenwood plat to consist of 18 blocks, arranged in three groupings (on Lots 2, 3, and 4 of Section 9) of six blocks each along the shore of Higgins Lake. The plat indicates that blocks one through six were located in Lot 2, blocks seven through 12 were located in Lot 3, and block A[5] and blocks 14 through 18 were located in Lot 4. Each block in Lots 2 and 4 contained 80 lots, arranged in two rows of 40 lots each.[6] The blocks in Lot 3 contained 82 lots, arranged in two rows of 41 lots each. Each lot measured approximately 32 by 65 feet. None of the lots touched the water. Instead, a large road known as Chicago Boulevard was designated to run along the shore of Higgins Lake for the length of the plat separating the lots from the lake. Platted roads separated each grouping of blocks, and each block was separated by alleys that ran parallel to the shore of Higgins Lake. Another alley of undetermined width stretched along the southern edge of the plat to Chicago Boulevard on the lakeshore. At the time, the northern 20 feet of Hitchcock Avenue was part of this plat, and the westernmost portion of this alley appears to corre-

---

Comprising Lots No. (2) two (3) three and four (4) of Section nine (9) Town 24N R3 West Roscommon Co Mich. Commencing at a point marked thus ⊗ at the meander post on the east bank of Higgins Lake on Section Line Between Section Nine and Sixteen. Then running East on Section Line 880 to West ⅛ Post Bet. Sec 9 & 16 marked thus. ⊗Thence north on West ⅛ line Sec Nine 3996.96 feet to NW ⅛ Post Sec nine marked Thus ⊗, thence west on north ⅛ line 1255 feet to meander post marked thus. ⊗ Thence southerly along the meander line Sec. Nine 4007 ft to the place of beginning.

[5] There is no Block 13 on the plat. Instead, what would sequentially be labeled "Blk 13" is instead labeled "Blk A."

[6] Although these individual parcels are not called "lots" on the plat, but are simply numbered, they are referred to as "lots" in subsequent deeds. We will use the term "lots," with a lowercase "l," to refer to these smaller parcels, and to distinguish these parcels from the larger Lots 2, 3, and 4.

spond with the 20-foot strip.[7] The plat specified that "the Streets as shown on said pl[at] are hereby dedicated to the use of the Public."

Between 1903 and 1909, Myrtle E. Hellen purchased either all or a substantial portion of the property in the Kenwood plat. After acquiring this property, Hellen petitioned the circuit court to vacate the Kenwood plat. The portion of Hellen's petition for vacation included in the lower court record indicates that she sought vacation of the plat, in part, because the plat was badly conceived. According to the petition, the widths of the streets and alleys were not clearly laid out and, apparently, the property had never been marked to show the layout of the plat, making it impossible for Hellen to resell the property and artificially increasing the taxable value of her land. Finally, Hellen requested "that the court may vacate the said plat and its lots, blocks, streets, and alleys . . . ." The Roscommon Circuit Court, recognizing that there appeared to be no opposition to Hellen's petition, entered an order vacating the Kenwood plat on September 9, 1909, which was recorded by the register of deeds on August 13, 1912.

In its initial motion for summary disposition, plaintiff submitted an affidavit from the owner of a local title search company, who claimed that according to a title search that she conducted, Hellen never conveyed the 20-foot strip of land at the southern edge of her property (which included the 20-foot strip at issue in this case) when she sold her land years after the plat was vacated. However, both parties later agreed that the information provided in this affidavit was incorrect, because Hellen did include the 20 feet at the southern edge of her property in her subsequent sale of this land.

---

[7] Although the plat is unclear regarding the exact width of the alleys, the parties agree that the alley in question is 15 feet in width.

Further, the parties submitted deeds detailing the subsequent property transfers that included the 20-foot strip. On February 17, 1922, Hellen sold to William J. Tenney a 400-square-foot parcel of property that included the 20-foot strip. On April 28, 1924, Tenney sold a portion of the property, including the 20-foot strip, to Charles H. DeWaele. On May 19, 1924, DeWaele sold a portion of the property, including the 20-foot strip, to Charles T. Hayden. On July 4, 1924, Hayden sold his property to Osian and Hulda Anderson, with the guarantee that the property was free from encumbrances. The property deeded to the Andersons included the 20-foot strip.[8]

In February 1931, the Andersons sold some of their property to Francis and Faith Ross. The parcel that the Andersons sold to the Rosses excluded the 20-foot strip in question.[9] The Andersons continued to own this

---

[8] The deed described the property owned by the Andersons as follows:

Commencing at the meander post between sections nine and sixteen, township twenty-four north, range three (3) west, thence east on section line four hundred feet, thence north at right angles two hundred and fifty feet, thence westerly and parallel with said section line to the shore of Higgins Lake, thence southerly along the shore of Higgins Lake to the place of beginning, being part of Lot (4) four, section (9) nine, township twenty-four (24) north, range three (3) west.

[9] The parcel that the Rosses acquired in this transaction is described as follows:

Commencing at a point on the shore of Higgins Lake twenty (20) feet north of the meander post between Section Nine (9) and Sixteen (16) from place of beginning, thence East four hundred (400) feet thence north seventy three and one half (73½) feet, thence west about four hundred (400) feet to the shore of Higgins Lake, thence southerly about seventy three and one half (73½) feet along the shore of Higgins Lake to a line drawn east and west through the point of beginning, thence east along this line to point of beginning, except the following described property, commencing twenty (20) feet north and two hundred (200) feet east of the

strip, along with a 156½-foot parcel north of the Ross parcel and the land described in the exception to the 1931 deed. No subsequent transfers of the 20-foot strip were discovered, and the Andersons are the last owners of record of the strip.[10]

The Rosses owned the property they purchased from the Andersons for the rest of their lives.[11] In 1973, Francis and Faith Ross created a trust, in which Francis was trustee, and transferred ownership of their property to the trust. In 1995, the property was sold to Paul and Nancy Rose. In July 2000, the Roses sold approximately half their property to Thomas and Claudia McLellan. None of these property transfers included the 20-foot strip.

### D. PUBLIC DEDICATION OF HITCHCOCK AVENUE

Although the Kenwood plat dedicated all the streets and alleys depicted therein to the use of the public, the

---

meander point between Sections Nine (9) and Sixteen (16) for a point of beginning, thence east thirty (30) feet, thence north seventy-three and one half (73½) feet, thence west thirty (30) feet, thence south seventy-three and one half (73½) feet to place of beginning. The land hereby conveyed is seventy three and one half feet in width throughout and is part of Lot Four (4), Section Nine (9), Township Twenty-four (24) North Range Three (3) West.

The deed parties of the second part, their heirs and assigns forever, shall have in common with first party, his heirs or assigns forever, the use for road purposes of the land excepted by the conveyance.

[10] The record does not indicate whether the Andersons later sold the 156½-foot parcel. Apparently the Andersons' heirs have not been identified, and they were never contacted regarding, nor are they involved in, this litigation.

[11] It appears that at some point the Rosses bought an additional 73½ feet to the north of their lot, making the total width of their lot 147 feet. Regardless, none of the descriptions of their property included in the lower court record include the 20-foot strip.

parties provided no evidence that the county accepted this dedication before the Kenwood plat was vacated. In fact, the parties provide no evidence that the county road commission took formal steps to accept dedications of any streets and alleys in the county before the 1930s. Plaintiff submitted copies of county maps from 1931 through the present that depicted Hitchcock Avenue as going to the edge of Higgins Lake, although a road commission employee admitted that the maps did not indicate the widths of the roads depicted. Plaintiff also submitted the minutes of an April 2, 1937, meeting of the Roscommon County Road Commission indicating that the county road commission had resolved to take over maintenance of all dedicated streets and alleys in all recorded plats in the county and a later resolution (apparently from 1953) designating these streets and alleys as county roads. Although the minutes of the 1937 meeting do not provide a list of the recorded plats in question, a handwritten note from this time written by a county official includes Kenwood among the list of recorded plats, even though the plat had been vacated for over 25 years at this point. A 1953 road commission resolution reaffirming under 1951 PA 51 the commission's prior takeover of roads pursuant to the McNitt act, 1931 PA 130, repealed by 1951 PA 51, § 21, did not include the plat of Kenwood among the recorded plats whose streets and alleys were taken over as county roads. The plat of Pine Bluffs was included.

At its April 16, 1940, meeting, the road commission resolved to incorporate particular metes-and-bound roads into the county road system. The roads listed for incorporation into the county road system included the road located on the north side of Section 16, but did not include a road located on the south side of Section 9.

In its answer to a discovery request, the road commission admitted that although it had historically considered the 20-foot strip to be part of Hitchcock Avenue, it could not find any information in its records indicating that there was "any dedication or conveyance which created this 20 [foot] portion of the road." Instead, the road commission averred that because there was continuous public use of the 20-foot strip for nearly a century, the 20-foot strip would be a road pursuant to the highway-by-user doctrine. At the trial in this case, Gloria Burns, a long-time employee and administrator of the Roscommon County Road Commission, testified that although it was the road commission's position that it had jurisdiction over the 20-foot strip and some maps depicted a part of Hitchcock Avenue as falling north of the section line, the road commission was unable to find any documentation confirming that it had accepted and certified the 20-foot strip as part of Hitchcock Avenue. Burns explained that "McNitt roads were accepted listing everything by plat" and that because mapmakers drawing a road on a section line tended to draw the road down the middle of a section line, the fact that part of Hitchcock Avenue was depicted as being north of the section line at the water's edge did not mean anything.

When asked if the road commission had ever performed maintenance on either the 20-foot or the 30-foot strips, Burns replied:

> Not that we can find in our records and not to anyone that I have asked. In fact, I asked someone just yesterday when I went to visit the site, Clint Stauffer, worked for the road commission for thirty-nine years, hiring in about sometime in the Fifties, I thought maybe he would know if we put that ramp in or we did some type of work, you know,

on the other side. He said we have never done anything down there in any position that he has been in, nor has the current foreman.

Burns also acknowledged that a 1957 road commission map labeled the land at the end of Hitchcock Avenue "DeWitt Landing." Finally, she acknowledged that the 20-foot strip never contained a paved or dirt area that would permit vehicular access to the lake.

### E. TESTIMONY OF MYRTLE MOORE

Myrtle Rydell Moore, an elderly area resident, discussed her family's use of DeWitt's Landing in the 1920s. Moore, who was born and raised near DeWitt's Landing, would accompany her family to DeWitt's Landing as a young child, where they would swim, recreate, and have parties and picnics. Moore explained that her family would usually recreate at an area along the lakeshore just to the south of DeWitt's Landing, along the beach in front of the cottages that were later built at the northern edge of the Pine Bluffs plat. Moore indicated that there was a "path" to the water that her family used to get to DeWitt's Landing, although she did not indicate where this path was located or whether any part of it traversed the 20-foot strip. She believed that others must have used the path to the water as well, because the path was "well-worn." Her impression was that the property at DeWitt's Landing was "[a]vailable for use by anyone."

Moore claimed that the area became known as "DeWitt's Landing" after the DeWitts built their house on the property immediately to the south of the 30-foot strip, but she could not remember when this occurred. She estimated that people began referring to the site as "DeWitt's Landing" in the late 1930s or early 1940s. According to Moore, the DeWitts often would maintain

the trail to the lake, keeping it free from snow in the winter and maintaining the path throughout the year so that "back-lot" neighbors could reach the lake. Moore claimed that Mr. DeWitt "did whatever he could to encourage" his neighbors to use DeWitt's Landing.

Moore testified that she would see cars drive down to the lake to unload boats into the water. She also saw others use the path in question to take trucks onto the lake to cut ice during the winter. Moore and her family would not picnic in the area where boats were launched into the water, but "to the side." Moore did not believe that the road commission ever maintained or plowed the lake access point, stating instead that she believed that the road commission "only went as far as where the people drove in to their house or garage." Moore was never asked, and never indicated, whether the path and the vehicular access to the lake were on the 20-foot strip or on the 30-foot strip.[12]

### F. HISTORICAL USE OF DEWITT'S LANDING

Although Moore testified regarding the historical use of DeWitt's Landing as a recreational area and lake access point, it appears that by the 1940s and 1950s, DeWitt's Landing was overgrown and an "eyesore."[13]

---

[12] Moore discussed the contents of four photographs from the 1920s depicting her and her family recreating near DeWitt's Landing. In one of these photographs, a dirt road can be seen in the distance, and Moore claimed that this was the path or trail that she and her family used to access the lakeshore. The road depicted in the photograph does not appear to be within 120 feet of the water. Instead, it appears to be further back, where the paved portion of Hitchcock Avenue is located.

[13] Plaintiff claims that photographs from the 1940s depict a trail over the 20-foot strip to the lake. The trial court never discussed these photographs. These photographs depict a scrubby, sandy area roughly where the beach on the 20-foot strip is now located. It is not apparent from these photographs that the sandy area depicted is, in fact, a road.

Defendant Victor Teichman explained that when his family first came to the area in 1948, the property consisted of a

> gully wash-out with tin cans and junk and brush that people had thrown in there. And it was not very easy to get down to the lake even on foot and some people were beginning to get little boats, like a little rowboat or maybe a small aluminum boat or something. And they would try it back down there to unload their boat and have a problem getting out and it was a bad situation.

According to its members, apparently the DeWitt Landing Association, the precursor to the DLDA, was formed at some point in the late 1950s or early 1960s, when Roy DeWitt, who owned the property immediately to the south of DeWitt's Landing, obtained permission from the county road commission to improve the road end. DeWitt contacted a number of backlot owners to form the DeWitt Landing Association (later the DLDA) and to help care for DeWitt's Landing. The association members paid for and constructed the cement terrace/retaining wall and flat patio for picnic tables, planted and maintained the grassy area for sunbathing, and filled in the area along the lake with sand for use as a beach. The association members also paid for and installed the cement drive leading to the lake.[14] For years, both DeWitt and the Rosses had no objection to DLDA members using the property. The Rosses were aware of and consented to DLDA's use of the 20-foot strip for picnicking, lounging, sunbathing, recreating, and overnight boat storage. In fact, on one occasion, Francis

---

[14] Photographs that appear to be from the early 1960s show a cement truck and depict local men (not construction workers) laying cement and digging out sod on the boat ramp. Apparently this ramp replaced an earlier boat ramp on the site.

Ross even agreed to move his fence when it was thought that the fence was encroaching on the right-of-way.

Apparently a barrier was first installed on Hitchcock Avenue at the eastern edge of the 20-foot strip in 1960. Earlier photographs of the site show a series of posts indicating a road end and blocking further vehicular traffic, while later pictures depict a guardrail. The blacktop ended at the guardrail. Although it is undisputed that the area of Hitchcock Avenue east of the guardrail is a 50-foot wide blacktop road used by the public and maintained by the county road commission, the parties have not identified any evidence that the road commission ever took any steps to maintain the 20-foot strip. Instead, many DLDA members confirmed that the 20-foot strip was never used or maintained as a road, but instead had been used for over 50 years by DLDA members and the public for lounging, sunbathing, and recreating. The DLDA maintained picnic tables and a bulletin board on the site, and members helped mow, clean, and maintain the 20-foot strip. DLDA members affirmatively testified that for over 50 years, they had never seen the county road commission, or any other governmental entity, maintain or otherwise perform any work on the 20-foot strip.

Every year, DLDA members would install a seasonal dock on the 20-foot wide strip that extended into Higgins Lake. Several DLDA members used the seasonal dock at the end of the 20-foot strip to dock and moor boats overnight; for some, this use stretched as far back as the 1940s.[15] DLDA members also used the public boat ramp at the end of the 30-foot strip for access to Higgins Lake.

---

[15] Apparently DLDA members conducted a lottery to determine which members could moor boats at the dock.

DLDA member Peggy McKibbin affirmed that her family had used the beach, dock, and bottomlands of DeWitt's Landing since 1941 and provided photographs as evidence. The photographs, dating from 1941 through 1991, show a dock and beach on the property. Victor Teichman, who testified regarding the depictions in the photographs, explained that a fence marked the property line separating the 20-foot strip from the Rosses' property, but there was no road on the property. Photographs from the late 1960s through the early 1990s show a paved boat ramp on what appears to be the 30-foot strip, and barriers blocking vehicular access to the 20-foot strip. The 20-foot strip contained a grassy area and, closer to the water, a cement retaining wall, a paved area for picnic tables, and a small beach. A dock then extended into the water, where boats were moored. Additional photographs submitted at trial also reflect this use of the property. None of the photographs submitted show the 20-foot strip being used as a road.

Beginning in the 1980s, the properties on the north and south sides of DeWitt's Landing began to change hands, and new owners began challenging the DLDA's historic use of the property. When a subsequent owner of the DeWitt property sought to have the road commission abandon the western 120 feet of Hitchcock Avenue in March 1987, several back-lot owners wrote letters opposing the proposed abandonment, noting that the general public regularly used the road-end to reach Higgins Lake. The county road commission voted against abandoning the road.

A few months later, the same landowner informed the road commission that picnic tables and a bulletin board, historically placed by DLDA members on the 20-foot strip, were located in the right-of-way. The road commission acknowledged these concerns and promised

to "review this site in the near future." However, there is no evidence that the road commission actually addressed or investigated this situation, and photographs show a bulletin board and picnic tables on the property as late as 2006. A 1991 flyer from the DLDA, which had been posted at DeWitt's Landing, indicated that the road commission provided no assistance in maintaining the property.[16]

G. THE MCLELLANS' OBJECTIONS REGARDING DEWITT'S LANDING

Thomas and Claudia McLellan currently own the property directly to the north of the 20-foot strip. Apparently the McLellans saw the property once before they purchased it, in November 1999, and there were no boats, hoists, or picnic tables on the 20-foot strip at the time.

Thomas McLellan, who testified at the bench trial in this case, did not appear to have any objection to most of the historical activities that took place on the 20-foot strip. He explained that the property had a "very long dock," and that individuals used the property "as a park, basically, swimming, lot of activities that weren't objectionable." McLellan's primary concern appeared to be with largely illegal activities that he claimed were occurring on the property, such as public urination and public intoxication. McLellan did not indicate that defendants or other DLDA members ever committed

---

[16] The flyer states:

> The Dewitt Landing Association, a group of 30 families, contribute money and volunteer work to provide maintenance of the grassy knoll, beach, dock and picnic tables for the public to enjoy. There is no maintenance assistance from any governmental organization and because litter of any kind left on the beach or road surface will wash into the lake with rain water and damage the delicate balance of nature in the lake water . . . we must be very diligent.

the offensive acts in question. McLellan also expressed concerns that children were accessing the lake at the 20-foot strip in order to swim unsupervised. McLellan later admitted that the activities on the property that he was concerned about were illegal, so precluding the DLDA from maintaining the area would not stop these activities from occurring.

## H. PROCEDURAL HISTORY

The McLellans created the Pine Bluffs Area Property Owners Association, Inc.,[17] which was incorporated as a nonprofit entity on January 19, 2006. Thomas and Claudia McLellan were listed as the only incorporators. Plaintiff, the Pine Bluffs Area Property Owners Association, Inc., then filed the complaint in this case, alleging that defendants were acting outside the scope of the common-law dedication dedicating the 20-foot strip as a public road and requesting that the trial court declare these activities to be a nuisance.

Plaintiff moved for summary disposition, arguing that the northern 20 feet of Hitchcock Avenue was dedicated to the public for use as a road through common-law dedication and, therefore, could not be used to erect permanent mooring structures in Higgins Lake, for nonincidental and nontemporary docking, and for recreational purposes. The trial court granted partial summary disposition to plaintiff, finding that questions of fact existed regarding whether the 20-foot strip constituted a road, but it also ordered that the 20-foot strip of land could no longer be used for nontemporary

---

[17] The McLellans' property is the land to the north of and adjacent to the 20-foot strip. As discussed earlier, this property is part of the former Kenwood plat, which was vacated in 1909. The property is not part of the plat of Pine Bluffs.

mooring of watercraft or to erect nontemporary moor-
ing structures on the bottom of Higgins Lake, including
boat hoists and wet anchors. This ruling was apparently
based on the trial court's determination that the prop-
erty was functioning as a de facto marina without a
permit, in violation of Michigan Department of Envi-
ronmental Quality (MDEQ) regulations. The trial court
also ruled that only one nonexclusive dock could be
erected within the entire 50-foot section of lake front-
age on Hitchcock Avenue, meaning that a dock could be
erected either on the 30-foot strip or on the 20-foot
strip, but not on both.[18]

After the August 2008 bench trial, the trial court set
forth its findings of fact on the record. In its statements,
the trial court indicated an apparent belief that the
20-foot strip was part of Hitchcock Avenue pursuant to
a statutory dedication. The trial court, noting that the
roads set forth in the Kenwood plat were dedicated to
the public, reasoned that the dedication was never
removed when the plat was later vacated. The court
then stated that Hellen had not excluded the southern-
most 20 feet of her property when she sold her property
after the plat was vacated, confirming that she had not
intended to remove the dedication of the streets and
alleys to the public in the Kenwood plat when she
sought vacation of the plat in 1909. When both parties
pointed out that Hellen had sold the southernmost 20
feet of her property as part of a larger conveyance and
that the Andersons were the first landowners who
chose not to include in the deed describing the property
conveyed the 20-foot strip when selling their property,
the trial court concluded, "Well, the portion dedicated

---

[18] At this time, a cross-claim that defendants had filed against the
MDEQ regarding the use of the dock on the 20-foot strip as a "marina"
without a proper permit was dismissed as moot.

in Kenwood to the public was never sold out by the Andersons, and if that doesn't indicate that they knew there was a road that was used for the public, I don't know what does." The trial court concluded that this 20-foot strip was then accepted as a road pursuant to a McNitt act resolution and that *Jacobs* applied to the scope of the dedication.

In a written judgment, the trial court ruled that the contested 20-foot strip was a public road established by common-law dedication and ordered that the 20-foot strip could no longer be used for recreational purposes, including "sunbathing, lounging, picnicking, and other activities that are non-incidental to the use of the water's surface of Higgins Lake." The court also prohibited nontemporary mooring of watercraft and the erection of nontemporary mooring structures, including boat hoists and wet anchors, on the bottomlands of Higgins Lake. Although in its oral findings from the bench the trial court had indicated a belief that defendants' activities were a nuisance, it did not address this issue in the written judgment.

## II. STATUS OF THE 20-FOOT STRIP

On appeal, defendants challenge the trial court's determination that the 20-foot strip is part of Hitchcock Avenue, arguing that particular findings of fact by the trial court were clearly erroneous and that the trial court's conclusion that the 20-foot strip was part of Hitchcock Avenue is incorrect. We agree. We review a trial court's findings of fact for clear error, MCR 2.613(C), and questions of law de novo, *Ross v Auto Club Group*, 481 Mich 1, 7; 748 NW2d 552 (2008).

In its judgment, the trial court indicated that the 20-foot strip was a public road pursuant to a common-law dedication. However, the trial court's fact-finding

does not clearly indicate how or why it came to this particular conclusion, and the trial court did not explicitly identify which facts supported its determination that a common-law dedication occurred. In its fact-finding at the close of the bench trial, the trial court determined that although the plat of Kenwood was vacated, the plat indicated that the streets depicted therein were dedicated to the use of the public. The court also acknowledged that the Pine Bluffs plat had dedicated the northern 30 feet of the plat toward the formation of what would become Hitchcock Avenue, and this 30-foot dedicated road included both the 30-foot strip of DeWitt's Landing and the southern 30 feet of Hitchcock Avenue. The trial court recognized that both the northern 20 feet of Hitchcock Avenue and the 20-foot strip were not part of a plat, but it also appeared to conclude that because this property was once part of a plat and had not been deeded out since then, both the 20-foot strip and the northern 20 feet of Hitchcock Avenue must have been dedicated as a road, and the dedication must never have been removed.

In particular, although the trial court ruled that the 20-foot strip was a public road pursuant to a common-law dedication, throughout its fact-finding it maintained that the 20-foot strip was a public road because the dedication of the Kenwood plat was never rescinded. Such reasoning appears to be more in keeping with a rationale that the 20-foot strip was part of Hitchcock Avenue pursuant to a statutory dedication. Finally, the parties raise as an issue whether the 20-foot strip could be considered a public road pursuant to the highway-by-user doctrine.

The somewhat disjointed reasoning presented by the trial court, as well as the parties' desire to address whether the property in question is a public road

pursuant to different theories of dedication and acceptance, reveals an important, fundamental point: proper adjudication of a dispute regarding whether a public road exists requires consideration of all three recognized means of creating a public road, namely, a statutory dedication and acceptance, a common-law dedication and acceptance, and recognition of a public road pursuant to the highway-by-user doctrine. In *Beulah Hoagland Appleton Qualified Personal Residence Trust v Emmet Co Rd Comm*, 236 Mich App 546, 554-555; 600 NW2d 698 (1999), this Court discussed these three methods under which property may become part of a public road:

> For a road to become public property, there generally must be a statutory dedication and an acceptance on behalf of the public, a common-law dedication and acceptance, or a finding of highway by public user. *Village of Bellaire v Pankop*, 37 Mich App 50, 54-55; 194 NW2d 379 (1971). For a statutory dedication under the Land Division Act, MCL 560.101 *et seq.*; MSA 26.430(101) *et seq.*, the well-established rule is that two elements are required: a recorded plat designating the areas for public use, evidencing a clear intent by the plat proprietor to dedicate those areas to public use, and acceptance by the proper public authority. *Kraus v Dep't of Commerce*, 451 Mich 420, 424; 547 NW2d 870 (1996). Public acceptance must be timely and must be disclosed through a manifest act by the public authority either formally confirming or accepting the dedication and ordering the opening of the street, or by exercising authority over it, in some of the ordinary ways of improvement or regulation. *Id.* Similarly, a valid common-law dedication of land for a public purpose requires (1) intent by the property owners to offer the land for public use, (2) an acceptance of the offer by the public officials and maintenance of the road by public officials, and (3) use by the public generally. *Bain v Fry*, 352 Mich 299, 305; 89 NW2d 485 (1958); *Boone v Antrim Co Bd of Rd Comm'rs*, 177 Mich App 688, 693; 442 NW2d 725 (1989). Finally,

establishing a public highway pursuant to the highway by user statute, MCL 221.20; MSA 9.21, requires (1) a defined line, (2) that the road was used and worked on by public authorities, (3) public travel and use for ten consecutive years without interruption, and (4) open, notorious, and exclusive public use. *Bain, supra.*

We will address each method of creation of a public road in turn, as well as whether the evidence supports a ruling that the 20-foot strip was a public road.

### A. STATUTORY DEDICATION

In *Kraus v Dep't of Commerce*, 451 Mich 420, 423; 547 NW2d 870 (1996), our Supreme Court considered a circumstance similar to that found in this case, addressing whether unimproved roads platted along the shore of Higgins Lake and dedicated to public use in the first decade of the last century had been accepted by the public. The *Kraus* Court identified the general, long-accepted rule for valid dedication of land in this state:

> In cases like these, the well-established rule is that a valid dedication of land for a public purpose requires two elements: a recorded plat designating the areas for public use, evidencing a clear intent by the plat proprietor to dedicate those areas to public use, and acceptance by the proper public authority. *Lee v Lake*, 14 Mich 11, 18 (1865). Public acceptance must be timely, *Wayne Co v Miller*, 31 Mich 447, 448-449 (1875), and must be disclosed through a manifest act by the public authority "either formally confirming or accepting the dedication, and ordering the opening of such street, or by exercising authority over it, in some of the ordinary ways of improvement or regulation." *Tillman v People*, 12 Mich 401, 405 (1864). In *Miller*, this Court explained that the requirement of public acceptance by a manifest act, whether formally or informally, was necessary to prevent the public from becoming responsible

> for land that it did not want or need, and to prevent land
> from becoming waste property, owned or developed by no
> one. *Id.* at 448. [*Id.* at 424.]

"However, the mere certification of a plat does not constitute acceptance of all the dedicated property." *Marx v Dep't of Commerce*, 220 Mich App 66, 74; 558 NW2d 460 (1996). Instead, the governmental authority must accept the publicly dedicated parcel of land in question, either by a formal resolution or informally through " 'the expenditure of public money for repair, improvement and control of the roadway' " or through public use. *Id.*, quoting *Eyde Bros Dev Co v Roscommon Co Bd of Rd Comm'rs*, 161 Mich App 654, 664; 411 NW2d 814 (1987), abrogated in part on other grounds by *Kraus v Gerrish Twp*, 205 Mich App 25, 46-47 (1994).

Further, timely acceptance of dedicated lands in a plat requires that the acceptance of the dedication "must take place before the offer lapses or before the property owner withdraws the offer." *Marx*, 220 Mich App at 78. "As long as a plat proprietor or his successors take no steps to withdraw an offer to dedicate land for public use, the offer is treated as continuing." *Id.* at 79. However, when the property owner undertakes an affirmative act to withdraw the offer, such as using the property in a manner that is inconsistent with public ownership, the offer of dedication is withdrawn. *Id.* at 80.

The Kenwood plat was dedicated in 1901 and vacated by court order in 1909. The parties provided no evidence that the county ever attempted to accept the dedication of the streets and alleys located in the Kenwood plat before its vacation, either by formal resolution, by expending money on the property, or by indicating that the public used the streets and alleys (including the 20-foot strip) for their intended purpose.

In fact, the parties provide no evidence regarding any use of the property until the 1920s, and a county road commission employee admitted that after a search of road commission records, she could not find any records of any dedication or conveyance that included the 20-foot strip as part of Hitchcock Avenue.

Instead, the plat was vacated before any acceptance of the dedication therein occurred. Further, Hellen, who owned most or all of the property in the plat at the time of its vacation, specifically requested in her petition that the "lots, blocks, streets, and alleys" in the plat be vacated, apparently because the layout of the plat made the property difficult to resell and affected her property taxes. Although the dedication of the public land in the Kenwood plat was not formally withdrawn through a separate court action, Hellen specifically requested the vacation of streets and alleys in the plat in her petition for vacation, and the trial court granted her request, vacating the plat in its entirety. In the absence of any evidence to the contrary, the vacation of the plat constitutes an affirmative act to withdraw the offer of dedication. See *Olsen v Village of Grand Beach*, 282 Mich 364, 368-369; 276 NW 481 (1937) (recognizing the vacation of a plat as equivalent of the withdrawal of a dedication).

Accordingly, the evidence presented at trial leads to only one conclusion; that the dedication of the streets and alleys in the Kenwood plat was withdrawn when the plat was vacated, before the county made any attempt to accept these streets and alleys. The trial court's conclusion to the contrary was clearly erroneous.

Further, instead of treating the vacation of the Kenwood plat as a withdrawal of the dedication before acceptance, the trial court appears to conclude that the

county formally accepted jurisdiction over the 20-foot
strip when it passed McNitt act resolutions in the
1930s, which were designed to incorporate township
roads and streets and alleys in dedicated plats into the
county road system. However, a general McNitt act
resolution does not constitute acceptance of a dedicated
road not specifically named in the resolution; instead, a
McNitt act resolution must expressly identify the plat-
ted road in dispute or the recorded plat in which that
road was dedicated "to effect manifest acceptance of the
offer to dedicate the road to public use." *Kraus*, 451
Mich at 430. And, although road commission resolu-
tions accepting jurisdiction over roads in certain plats
and certain county roads were presented as evidence,
the trial court never determined that the 20-foot strip
was specifically included among the road sections over
which the county road commission asserted jurisdic-
tion. In fact, the only listed metes-and-bounds descrip-
tion of roads absorbed by the county road system found
in the lower court record included a road on the north
side of Section 16 of Gerrish Township (presumably the
southern portion of Hitchcock Avenue), but did not
include a road on the south side of Section 9 of Gerrish
Township (which would include the 20-foot strip). A
road commission employee admitted that the road com-
mission could find no documentation confirming that it
had accepted and certified the 20-foot strip as part of
Hitchcock Avenue at any point.

More importantly, however, the Kenwood plat had
been vacated for over 25 years before the county road
commission passed the first McNitt act resolution. To
accept the public lands dedicated in the Kenwood plat,
the county had to accept the dedicated lands before the
offer was withdrawn. *Marx*, 220 Mich App at 78. Even if
the county road commission did attempt to accept the
dedication in the Kenwood plat through McNitt act

resolutions, any attempts at acceptance over 25 years after vacation of the plat (and corresponding withdrawal of the dedication in the plat) are certainly not timely.

The trial court also determined that the dedication of streets and alleys for public use was never withdrawn after the Kenwood plat was vacated because the deeds of the property transferred after the Kenwood plat was vacated did not include the 20-foot strip. However, as the deeds introduced into evidence make clear, and as both parties noted during the trial court's oral findings of fact, Hellen included the 20-foot strip when she sold her property in 1922, and the deed did not identify the 20-foot strip as a road or distinguish it in any way. The 20-foot strip continued to be included in deeds in subsequent sales in 1924, and eventually Osian and Hulda Anderson acquired ownership of the 20-foot strip, along with the property to the north of it. They subsequently did not include the 20-foot strip with the property that they sold to the Rosses in 1931. Although the trial court was made aware of this at the end of its fact-finding, the trial court did not change its ruling or indicate in any detail the extent, if any, to which its apparent misunderstanding of the facts might have affected its decision.

### B. COMMON-LAW DEDICATION

The trial court's rationale for determining that the 20-foot strip is a public road pursuant to common-law dedication is unclear. The clearest indication of its rationale for determining that a common-law dedication existed comes from its response to the parties at the end of its fact-finding, when the parties informed the trial court that several deeds describing transfers of the property after the Kenwood plat was vacated did not

include the 20-foot strip. When presented with this information, the court responded, "the portion dedicated in Kenwood to the public was never sold out by the Andersons, and if that doesn't indicate that they knew there was a road that was used for the public, I don't know what does." It appears that the trial court determined that a common-law dedication existed because all or part of the 20-foot strip had once been dedicated as a road in a plat that was subsequently vacated, and the Andersons did not include in the description of the property conveyed the 20-foot strip when they sold the adjacent property to the Rosses in 1931. The trial court appeared to conclude that this information established that the Andersons intended to dedicate the property as a road pursuant to a common-law dedication. We disagree.

Again, "a valid common-law dedication of land for a public purpose requires (1) intent by the property owners to offer the land for public use, (2) an acceptance of the offer by the public officials and maintenance of the road by public officials, and (3) use by the public generally." *Appleton Trust*, 236 Mich App at 554. A common-law dedication does not need to be formal, and "dedication may occur without a grant or even written words." *Boone v Antrim Co Bd of Rd Comm'rs*, 177 Mich App 688, 693; 442 NW2d 725 (1989). However, the *Boone* Court also noted that to have a common-law dedication, "there must be a clear and positive intent to dedicate, as unequivocally demonstrated by the actions of the owners. If intent is established, there must also be either an express declaration or some acts by a public authority indicating acceptance." *Id.* (citations omitted).

We do not agree with the trial court's conclusion that the mere fact that a subsequent owner of the property

did not convey the 20-foot strip by deed is sufficient to establish that this property is part of Hitchcock Avenue. Instead, we conclude that the evidence included in the lower court record is insufficient to establish that the Andersons intended to offer the 20-foot strip for public use when they excluded this property from their deed transferring title of some of their property to the Rosses. For this reason alone, the trial court's determination that the 20-foot strip is a public road pursuant to a common-law dedication is incorrect.

In the absence of any evidence to provide context for the sale, the Andersons' decision not to convey the 20-foot strip to the Rosses does not constitute an unequivocal demonstration of a clear and positive intent to dedicate the 20-foot strip to the public for use as a road. Although it is conceivable that the Andersons could have chosen not to convey the 20-foot strip because they intended for the property to be used as a road, it is also conceivable, for example, that they chose not to convey the 20-foot strip because they wanted to provide area residents with a site close to Hitchcock Avenue where they could recreate. Further, considering that the lower court record indicates that the Rosses consented to the historical recreational use of the 20-foot strip during their long residence at the property to the north of the strip, it is also conceivable that the Rosses chose not to purchase the 20-foot strip because they wanted their neighbors who lacked lake access to have a place available along the water for picnics and general recreation.

Further, we do not believe that the fact that all or part of the 20-foot strip had once been dedicated as a road in a vacated plat indicates that the Andersons had a clear and positive intent to dedicate the 20-foot strip to the public for use as a road when they sold some of

their property to the Rosses in 1931. The property that the Andersons purchased had changed hands several times after the Kenwood plat was vacated, and each of these transfers included the 20-foot strip as part of a larger parcel of property, without distinguishing the 20-foot strip or otherwise indicating that it was a road. Further, there is no evidence that the Andersons were even aware that all or part of the 20-foot strip had once been dedicated as a road. Without affirmative evidence that the Andersons were even aware that the property had once been dedicated as a road, we do not believe that a dedication in a plat vacated in 1909 is sufficient to establish that the Andersons had a clear and positive intent to dedicate the 20-foot strip to the public for a road in 1931.

In addition, the trial court appeared to base its conclusion that the Andersons intended to dedicate the 20-foot strip to the public as a road on its determination that the 20-foot strip had been used as a road for at least seven years by the time of the 1931 property transfer. The trial court based this fact-finding entirely on the testimony of a long-time Higgins Lake resident, Myrtle Moore, who had testified regarding her family's use of DeWitt's Landing for recreation in the 1920s. However, we agree with defendants that the trial court's factual determinations on this point are clearly erroneous.

When addressing whether the dedication of a strip of land along the southern boundary of the Kenwood plat was ever rescinded, the trial court stated:

> The only person we have who can say that is Myrtle Moore and she says—and she testified in her deposition, and it is there, that it was a road, they used it, people used it to launch, and that the DeWitts allowed them—the picture says in front of the DeWitt's—allowed people to use the beach in front of them, not that portion. And even if they did, does it outweigh the formal dedication, the

writing in the plat of Kenwood? Does it outweigh the
writing in the deeds out, where they don't deed out that
twenty feet? No. So we have that.

It is not clear from the trial court's statements how
much weight it placed on Moore's testimony when
determining whether the 20-foot strip was intended to
be a road, although the trial court admittedly placed
more weight on her testimony than on testimony con-
cerning later uses of the property. But regardless, the
trial court appeared to base its determination that the
20-foot strip was used as a road in the 1920s on a
misreading of Moore's testimony. Although Moore tes-
tified that she and her family would go to DeWitt's
Landing for recreation when she was a child, she never
specifically identified that the "path" that she and her
family used to get to the water was on the 20-foot strip,
and not on another part of the lakeshore. Further,
although she also testified that she saw individuals
drive trucks onto the lake to cut ice during the winter
and launch boats from the lakeshore, again, she never
identified whether this travel occurred on the 20-foot
strip. Accordingly, the trial court's determination that
Moore's testimony established that the 20-foot strip
was used as a road or path to the water is clearly
erroneous. At most, Moore's testimony establishes that
a road or path to the water existed in the general area,
but it does not, on its own, establish that the road or
path was specifically on the 20-foot strip.

Accordingly, we conclude that the trial court erred
when it determined that the 20-foot strip was a public
road through a common-law dedication. Because the
evidence included in the lower court record fails to
establish that the Andersons intended to offer the
20-foot strip for public use, we need not address the
other elements of a common-law dedication.

C. HIGHWAY-BY-USER DOCTRINE

The trial court never appeared to address whether the 20-foot strip is a public road pursuant to the highway-by-user doctrine. However, because the parties raise this as an issue, and because consideration of this doctrine is necessary to ensure a complete review of the issue, we will address whether the 20-foot strip is a public road pursuant to this doctrine. Again, to establish a public road pursuant to the highway-by-user statute, MCL 221.20, plaintiff must establish "(1) a defined line, (2) that the road was used and worked on by public authorities, (3) public travel and use for ten consecutive years without interruption, and (4) open, notorious, and exclusive public use."[19] *Appleton Trust,* 236 Mich App at 554-555. The evidence provided in the lower court record does not establish that the 20-foot strip is a road pursuant to the highway-by-user doctrine because it includes no evidence that the road was used and worked on by public authorities.

The evidence included in the lower court record is insufficient to establish that the road commission or other public officials ever used or maintained the 20-foot strip. Initially, the trial court determined that the road commission expended some money on the 20-foot strip, apparently by putting in a guardrail. However, we do not believe that the mere fact that the road commis-

---

[19] Although it is unclear whether the northern 20 feet of Hitchcock Avenue east of the guardrail is a public road by either statutory or common-law dedication, the county road commission, which has undisputedly maintained the entire 50-foot width of the road east of the guardrail for decades, would easily be able to establish that the entire 50-foot width of the paved, maintained portion of Hitchcock Avenue is a road pursuant to the highway-by-user statute. Accordingly, this Court's ruling with regard to the status of the 20-foot strip would not realistically call into question the road commission's jurisdiction over the maintained portion of Hitchcock Avenue.

sion put a guardrail and "Road Ends" sign up at the eastern edge of the 20-foot strip constitutes evidence that the road was used and worked on by public authorities. In fact, the presence of the guardrail and sign, both of which indicate to the public that the road ends at that point and not at the water's edge, *could* constitute evidence that the road commission would not, and did not, use or maintain the property to the west of the guardrail (consisting of virtually the entire 20-foot strip) as a road.[20]

Also, there is no evidence in the lower court record regarding whether the road commission actually performed maintenance work on the 20-foot strip itself. Instead, DLDA members testified (and their signs on the property indicate) that the road commission has never spent money on or otherwise maintained the 20-foot strip. Further, a road commission employee testified that she could find nothing in the road commission's records indicating that it performed maintenance on the 20-foot strip. Although there is some evidence that the road commission entertained requests to perform repairs on the boat ramp on the 30-foot strip and to seek removal of the picnic tables and bulletin board seasonally placed on the 20-foot strip, there is no evidence that the road commission ever acted on these requests. Accordingly, we conclude that the road commission never used and worked on the road, as is required to establish that certain property is a public road pursuant to the highway-by-user doctrine.

---

[20] Further, to establish this element, the road commission must demonstrate that it has kept the road in a "reasonably passable condition." *Boone*, 177 Mich App at 694. We do not believe that placing a guardrail and a "Road Ends" sign at the eastern edge of the 20-foot strip indicates that the road commission (as opposed to DLDA members) intended to do anything to maintain the 20-foot strip itself in a "reasonably passable condition."

III. APPLICATION OF *JACOBS*

Next, defendants claim that the trial court erred when it concluded that the limitations set forth in *Jacobs*, regarding the use of road ends along Higgins Lake, applied to the 20-foot strip because the 20-foot strip is not a road and, even if the 20-foot strip were a road, *Jacobs* does not apply to roads created by common-law implied dedication. *Jacobs* addresses whether certain activities occurring at the end of a platted road along the shore of Higgins Lake violated the statutory dedication of the street in the original plat " 'to the use of the Public.' " *Jacobs*, 199 Mich App at 671. The *Jacobs* Court specifically confined its review to the question "whether the disputed activities are within the scope of the plat dedication." *Id.* Because we have concluded that the 20-foot strip is not a road under any of the previously discussed theories, this issue is moot.

IV. ADVERSE POSSESSION AND PRESCRIPTIVE EASEMENT CLAIMS

Defendants argue that they have a vested right in the 20-foot strip under either a theory of adverse possession or prescriptive easement. Because the 20-foot strip is not a road, the road commission has not acquired any jurisdiction over the 20-foot strip. Accordingly, title to the property rests in the Andersons, the last titleholders of the property, and their heirs or devisees.

There is no evidence that the Andersons or their descendents still maintain a presence at Higgins Lake. Yet the evidence also indicates that the DLDA, a non-profit organization, used and maintained the 20-foot strip for at least 50 years. The evidence suggests that in this situation, the DLDA might have a claim of adverse

possession.[21] Alternately, the evidence presented also suggests that defendants might have a prescriptive easement over the property.[22] Because the trial court erroneously determined that the 20-foot strip was a road, it never addressed these issues. In light of our conclusion that the 20-foot strip is not a road, however, this question again becomes relevant. However, because a determination whether the DLDA has either adverse possession or a prescriptive easement over the property involves weighing evidence and making factual deter-

[21] This Court has listed the circumstances under which a claim of adverse possession may be established:

In order to establish a claim of adverse possession, a plaintiff must provide "clear and cogent proof that possession has been actual, visible, open, notorious, exclusive, continuous, and uninterrupted for the statutory period of fifteen years." *Kipka v Fountain*, 198 Mich App 435, 439; 499 NW2d 363 (1993). The fifteen-year period begins when the rightful owner has been disseised of the land. MCL 600.5829. "Disseisin occurs when the true owner is deprived of possession or displaced by someone exercising the powers and privileges of ownership." *Kipka*, [198 Mich App] at 439. In addition, a plaintiff must also show that the plaintiff's actions were "hostile" and "under claim of right," meaning that the use is "inconsistent with the right of the owner, without permission asked or given, and which use would entitle the owner to a cause of action against the intruder." *Wengel v Wengel*, 270 Mich App 86, 92-93; 714 NW2d 371 (2006) (quotation marks and citation omitted). [*Canjar v Cole*, 283 Mich App 723, 731-732; 770 NW2d 449 (2009).]

[22] "An easement by prescription results from use of another's property that is open, notorious, adverse, and continuous for a period of fifteen years." *Plymouth Canton Community Crier, Inc v Prose*, 242 Mich App 676, 679; 619 NW2d 725 (2000). A prescriptive easement is either

"(1) a use that is adverse to the owner of the land or the interest in land against which the servitude is claimed, or

"(2) a use that is made pursuant to the terms of an intended but imperfectly created servitude, or the enjoyment of the benefit of an intended but imperfectly created servitude." [*Mulcahy v Verhines*, 276 Mich App 693, 700; 742 NW2d 393 (2007), quoting 1 Restatement Property, 3d, Servitudes, § 2.16, pp 221-222 (emphasis omitted).]

minations, it would be premature for this panel to address these questions at this time. Instead, we remand this case to the trial court in order to permit the parties to pursue these issues further. In so doing, we advise the parties that it would be prudent to attempt to contact the Andersons or their heirs or devisees and add them as parties.

### V. SUMMARY PROHIBITIONS REGARDING MOORING AND BOAT HOISTS

Defendants argue that the trial court erred when it granted plaintiff's motion for summary disposition in part and prohibited the DLDA from placing boat hoists in the water or mooring boats, claiming that this determination was incorrect and premature. We agree. Any determination regarding whether the DLDA is entitled to permit its members to place boat hoists in the water or to moor boats on the 20-foot strip depends on the nature of the rights that the DLDA has to the property. Accordingly, our review of this issue would be premature. Instead, remand for further fact-finding is necessary to determine actual rights to the 20-foot strip. After a determination is made regarding the nature of the DLDA's interest, if any, in the 20-foot strip, the trial court will then be in a position to reconsider the nature of the DLDA's right to place boat hoists in the water or moor boats in the water off the 20-foot strip in light of this factual determination.

### VI. NUISANCE

Finally, defendants question the trial court's ruling that certain uses of the 20-foot strip constitute a nuisance. In particular, defendants claim that the evidence presented did not support the trial court's determination and, regardless, plaintiff had no claim under

the theory of coming to the nuisance. Defendants also argue that the trial court erred when it determined that prohibiting the historical uses of DeWitt's Landing, including use of the property for sunbathing, picnicking, and recreating, would be sufficient to abate the activities that were allegedly the source of plaintiff's allegation of nuisance. Because nuisance-abatement proceedings are generally equitable in nature, our review is de novo. *Capitol Props Group, LLC v 1247 Center Street, LLC*, 283 Mich App 422, 430; 770 NW2d 105 (2009).

The trial court's holding with regard to this issue is unclear. The trial court addressed the nuisance issue in its oral findings of fact, indicating that a nuisance existed because people were making loud noises, urinating, and having bonfires on the 20-foot strip. The trial court then appeared to conclude that a nuisance existed because DLDA members were using the property in a manner inconsistent with the limitations set forth in *Jacobs*. The judgment in this case does not address the nuisance issue specifically; instead, it simply prohibits certain activities on the 20-foot strip, including sunbathing, lounging, picnicking, and other activities non-incidental to the use of the water's surface of Higgins Lake, because these activities are "beyond the scope of the dedication." The trial court never actually ruled, either at the bench trial or in its judgment, that making loud noises, urinating, and having bonfires on the 20-foot strip was a nuisance, nor did it issue a ruling preventing these activities from occurring.

We speculate that the trial court simply concluded that its judgment restricting the use of the 20-foot strip would be sufficient to address any alleged nuisance. The trial court's statements at trial, combined with its failure to address the issue in its judgment in this case,

indicate that the trial court might have found the nuisance issue moot in light of its ruling restricting use of the 20-foot strip. It also appears that the trial court's order restricting certain uses of the 20-foot strip is simply an application of the limits of the uses of platted road ends set forth in *Jacobs*. However, in light of our holding that the 20-foot strip is not a road, remand to the trial court is necessary with regard to this issue. On remand, the trial court must readdress the issue to determine whether any of defendants' alleged activities on the 20-foot strip constitute a nuisance and issue a ruling to that effect.[23]

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

---

[23] In its brief, plaintiff acknowledges that it is seeking relief under a theory of private nuisance. In *Capitol Props Group*, 283 Mich App at 431-432, this Court stated:

> The elements of a private nuisance are satisfied if (a) the other has property rights and privileges in respect to the use or enjoyment interfered with, (b) the invasion results in significant harm, (c) the actor's conduct is the legal cause of the invasion, and (d) the invasion is either (i) intentional and unreasonable, or (ii) unintentional and otherwise actionable under the rules governing liability for negligent, reckless, or ultrahazardous conduct. *Cloverleaf Car Co* [*v Phillips Petroleum Co*, 213 Mich App 186, 193; 540 NW2d 297 (1995)]. To prove a nuisance, significant harm to the plaintiff resulting from the defendant's unreasonable interference with the use or enjoyment of property must be proven. *City of Jackson v Thompson-McCully Co, LLC*, 239 Mich App 482, 490; 608 NW2d 531 (2000).

Accordingly, the trial court would need to apply this test to determine if a nuisance, in fact, occurred in this case.