OAKLAND COUNTY v DEPARTMENT OF MENTAL HEALTH

Docket No. 104795. Submitted February 7, 1989, at Lansing. Decided
    July 5, 1989. Leave to appeal applied for.

 Oakland County and two taxpayers brought an action in the
    Oakland Circuit Court against the Department of Mental
    Health and others to enjoin defendants from classifying money
    spent by the state for the care of mentally ill and developmen-
    tally disabled people as spending paid to local units of govern-
    ment under the Headlee Amendment. The court, James S.
    Thorburn, J., held the statute requiring such a classification to
    be unconstitutional and enjoined the classification of such
    spending as spending paid to local units of government. Defen-
    dants appealed.

 The Court of Appeals *held:*

 1. The provision of mental health care services is a state
obligation and state money spent for that purpose is not money
paid to a local unit of government for Headlee Amendment
purposes even where the money is technically paid to the local
unit of government to discharge the state's obligation.

 2. The statute providing that money paid by the state to pay
costs incurred for services for the mentally ill and developmen-
tally disabled county residents is money paid to a local unit of
government is unconstitutional.

 3. The court did not err in granting the declaratory judgment
or the injunction.

 Affirmed.

 SULLIVAN, J., dissented. He would hold that, if the local unit
of government assumes the obligation for care of the mentally
ill and developmentally disabled and the state provides funds to
the unit to carry out its program, such funds are spending paid
to a local unit of government for purposes of the Headlee
Amendment. He would reverse.

1. MENTAL HEALTH — CONSTITUTIONAL LAW — HEADLEE AMENDMENT.
 The provision of mental health care services is a state obligation
 and state money spent for that purpose is not money paid to a

REFERENCES
Am Jur 2d, Constitutional Law § 235.

local unit of government for Headlee Amendment purposes even where the money is technically paid to the local unit of government to discharge the state's obligation (Const 1963, art 9, § 30; MCL 18.1304[32]; MSA 3.516[304][3]).

2. MENTAL HEALTH — CONSTITUTIONAL LAW — HEADLEE AMENDMENT.
    The statute providing that money paid by the state to pay costs incurred for services for the mentally ill and developmentally disabled county residents is money paid to a local unit of government is unconstitutional (Const 1963, art 9, § 30; MCL 18.1350[2]; MSA 3.516[350][2]).

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Michael A. Nickerson* and *Thomas L. Casey,* Assistant Attorneys General, for defendants.

*Kohl, Secrest, Wardle, Lynch, Clark & Hampton* (by *William P. Hampton* and *John M. Donohue*), for plaintiffs.

Amicus Curiae:

*Clark, Hardy, Lewis, Pollard & Page, P.C.* (by *Dennis R. Pollard*), for Oakland County Intermediate School District.

Before: GILLIS, P.J., and SULLIVAN and GRIFFIN, JJ.

GILLIS, P.J. Taxpayer-plaintiffs sued the state, claiming that its practice of classifying money spent for the care of mentally ill and developmentally disabled individuals as spending paid to local units of government was unconstitutional pursuant to Const 1963, art 9, § 30. The trial court granted a declaratory judgment in plaintiffs' favor, holding that such expenditures were not state spending to local units of government for purposes of Const 1963, art 9, § 30 and that MCL 18.1350(2); MSA 3.516(350)(2) was unconstitutional. The court

enjoined the director of the Department of Management and Budget and those persons acting in concert or in cooperation with him from treating such spending as state spending to local units of government. Defendants appeal as of right. We affirm.

In 1974, the Legislature revised the Mental Health Code. MCL 330.1001 *et seq.*; MSA 14.800(1) *et seq.* MCL 330.1116; MSA 14.800(116) provides in part:

> Pursuant to section 51 of article 4 of the constitution of 1963, which declares that the health of the people of the state is a matter of primary public concern; and pursuant to section 8 of article 8 of the constitution of 1963, which declares that services for the care, treatment, or rehabilitation of those who are seriously mentally handicapped shall always be fostered and supported; the department shall continually and diligently endeavor to ensure that adequate and appropriate mental health services are available to all citizens throughout the state. To this end the department shall have the following general powers and duties:
>
> *  *  *
>
> (d) It may operate directly or through contractual arrangement such facilities as are necessary or appropriate.
>
> (e)(i) It shall administer the provisions of chapter 2 so as to promote and maintain an adequate and appropriate system of county community mental health services throughout the state.
>
> (ii) In the administration of chapter 2, it shall be the objective of the department to shift from the state to a county the primary responsibility for the direct delivery of public mental health services whenever such county shall have demonstrated a willingness and capacity to provide an adequate and appropriate system of mental health services for the citizens of such county.

(f) It shall engage in planning for the purpose of identifying, assessing, and enunciating the mental health needs of the state.

(g) It shall endeavor to develop and establish arrangements and procedures for the effective coordination and integration of all public mental health services, and for effective cooperation between public and nonpublic services, for the purpose of providing a unified system of statewide mental health care.

(h) It shall review and evaluate the relevance, quality, effectiveness, and efficiency of mental health services being provided by the department and shall assure such review and evaluation for mental health services being provided by county community mental health programs.

(i) It shall implement or cause to be implemented those provisions of law under which it is responsible for the licensing or certification of mental health facilities or services.

(j) It may enter into any agreement, contract, or arrangement with any public or nonpublic entity that is necessary or appropriate to fulfill those duties or exercise those powers that have by statute been given to the department.

County community mental health programs were established pursuant to MCL 330.1200 *et seq.*; MSA 14.800(200) *et seq.* A county program is established by a majority vote of the county board of commissioners. MCL 330.1210; MSA 14.800(210). The county community mental health board evaluates the mental health needs of the county and decides upon the services necessary to meet those needs. *Id.* The county community mental health board also reviews and submits an annual budget plan to the county board of commissioners. *Id.* Once the county board of commissioners approves the plan and the budget, the county community mental health board submits both to the Department of Mental Health. *Id.* This is treated as the

county's official application for state funds. *Id.* The county community mental health board also submits to its own county's board of commissioners a request for county funds to support its county program. *Id.* The county community mental health board may also seek private, federal and other public funds to support its county program. *Id.* The community mental health board also appoints a director who must meet qualifications prescribed by the DMH.

The county community mental health board approves and authorizes all contracts for providing services and reviews the quality, effectiveness and efficiency of its program services. *Id.* Contracts entered into with the DMH's facilities or entities must be approved by the DMH's director. MCL 330.1228; MSA 14.800(228).

The DMH reviews each county's annual plan and budget and may approve or disapprove it in whole or part. MCL 330.1232; MSA 14.800(232). State financial support is conditioned upon approved plans and budgets. *Id.* If the amount of state-appropriated funds is insufficient to fund all the approved plans and budgets, the DMH shall divide the money in the manner it prescribes. *Id.* When the DMH disapproves a county program's annual plan and budget, the county community mental health director or board may specifically request a review. MCL 330.1238; MSA 14.800(238). After consulting with the requesting party, the DMH may take final action. *Id.*

With the exception of certain expenditures, MCL 330.1242; MSA 14.800(242), expenditures by the county program are eligible for state financial support. MCL 330.1240; MSA 14.800(240).

The DMH is responsible for coordinating and integrating state services and county programs and reviewing the county programs. MCL

330.1244(a) and (b); MSA 14.800(244)(a) and (b). The DMH also has the responsibility of establishing the Michigan conference of county community health programs. MCL 330.1246; MSA 14.800(246).

In 1975, MCL 330.1302; MSA 14.800(302) provided:

> Except as otherwise provided in this chapter, a county shall be financially liable for 10% of the net cost of any service, excluding a service provided to an individual under criminal sentence to a state prison, that is provided by the department, directly or by contract, to a resident of that county.

In 1975, MCL 330.1308; MSA 14.800(308) provided:

> Except as is otherwise provided in this chapter, and subject to the constraint of funds actually appropriated by the state legislature for such purpose, the state shall pay 90% of the annual net cost of a county community mental health program that is established and administered in accordance with chapter 2.

MCL 330.1316; MSA 14.800(316) provides:

> The expenditure of a county's tax funds to pay for services provided by the state or to pay the county's cost of supporting a county program may be made from the county's general tax fund or from the proceeds of a special tax established for such purpose.

Const 1963, art 9, §§ 25-34, also known as the Headlee Amendment, was ratified in 1978. The amendments were proposed as part of a nationwide taxpayer revolt in which taxpayers were attempting to limit legislative expansion of re-

quirements placed on local government, to put a freeze on what they perceived to be excessive government spending and to lower their state and local taxes. *Durant v State Bd of Ed,* 424 Mich 364, 378; 381 NW2d 662 (1985).

Const 1963, art 9, § 29 provides:

> The state is hereby prohibited from reducing the state financed proportion of the necessary costs of any existing activity or service required of units of Local Government by state law. A new activity or service or an increase in the le[v]el of any activity or service beyond that required by existing law shall not be required by the legislature or any state agency of units of Local Government, unless a state appropriation is made and disbursed to pay the unit of Local Government for any necessary increased costs. The provision of this section shall not apply to costs incurred pursuant to Article VI, Section 18.

In *Durant, supra,* p 379, our Supreme Court noted that this section clearly reflected an effort on the part of the voters to forestall any attempt by the Legislature to shift responsibility for services to the local government, once its revenues were limited by the Headlee Amendment, in order to save the money it would have had to use to provide the services itself.

Const 1963, art 9, § 30 provides:

> The proportion of total state spending paid to all units of Local Government, taken as a group, shall not be reduced below that proportion in effect in fiscal year 1978-79.

By dividing payments classified as state spending paid to all units of local government by state spending for all purposes, the DMB determined that 41.61 percent of the total state spending had been

paid to local governments in the fiscal year 1978-79. The DMB used the following criteria to determine whether state spending was paid to local government:

(1) The unit must be a governmental entity.

(2) The unit must receive payment from the state.

(3) The source of the payment must be from state-raised revenues rather than from federal funds or private or local funds which might flow through the state treasury.

In arriving at the 41.61 percent figure, the DMB treated state spending for state-owned and state-operated facilities for the mentally ill and developmentally disabled as a departmental transfer (i.e., the money was appropriated directly to DMH). The funds were not treated as state spending to local units of government because no community mental health board had assumed the responsibility for providing such care.

MCL 18.1304(3); MSA 3.516(304)(3) now provides:

"State spending paid to units of local government" means the sum of total state spending from state sources paid to a unit of local government. State spending paid to a unit of local government does not include a payment made pursuant to a contract or agreement entered into or made for the provision of a service for the state or to state property, and loans made by the state to a unit of local government.

In 1980, the state reclassified state spending for state-owned and state-operated facilities for the mentally ill and developmentally disabled as state spending paid to local units of government.

In September, 1981, the DMH offered county

community health boards the opportunity to enter into shared management contracts which transferred to the boards a share of the responsibility for planning and coordinating all public mental health services, including planning and coordination of in-patient and residential facilities. Under these contracts, the state paid to the county mental health boards the cost of servicing county residents in in-patient and residential facilities and, in turn, the county repaid that same amount to the DMH within forty-five days. During that forty-five day period, the county earned interest on the money.

After September, 1981, the DMH offered county community health boards the opportunity to enter into full management contracts, which transferred to the county the complete responsibility for providing mental health services (i.e., the county community mental health boards could contract with qualified mental health care providers, including state-owned and state-operated facilities, to provide inpatient and residential services).

State Representative Donald H. Gilmer wrote to the Attorney General asking his opinion on the reclassification of these state funds as money paid to local units of government. The Attorney General replied in OAG, 1982, No 6022, p 514 (January 7, 1982). Gilmer first asked:

> May the money made available to the community mental health boards be counted as money paid to local units of government in order to maintain compliance with Const 1963, art 9, § 30? [*Id.* at 514.]

The Attorney General noted that: (1) MCL 330.1116(e)(ii); MSA 14.800(116)(e)(ii) encouraged increased local responsibility for furnishing mental

health services; (2) community mental health
boards had the authority to provide inpatient ser-
vice, MCL 330.1208(d); MSA 14.800(208)(d); and (3)
community health boards could provide these ser-
vices directly or by contract, including contracts
with DMH. *Id.* at 515. The Attorney General then
concluded that, where the county willingly as-
sumed the responsibility for providing mental
health services, the resultant state expenditures
must be considered state spending paid to a unit of
local government within the contemplation of
Const 1963, art 9, § 30. *Id.* The Attorney General
then opined that Const 1963, art 9, § 29 was also
not violated because the county was not required
to take over any new service, but did so at its
option.

While Oakland County established a county
community mental health board, it did not enter
into either a full or shared management contract
with the DMH despite numerous negotiations.

In 1984, the Legislature approved MCL
18.1350(2); MSA 3.516(350)(2), which provides:

> If the state incurs the cost of services for the
> mentally ill and developmentally disabled provided
> after September 30, 1981, for county residents as
> authorized by section 116 of the mental health
> code, Act No. 258 of the Public Acts of 1974, being
> section 330.1116 of the Michigan Compiled Laws,
> on behalf of a unit of local government or in lieu
> of making payments to a unit of local government
> for its provision of the same services, and the unit
> of local government has exercised an option which,
> by law, results in the state incurring these costs
> on the unit of local government's behalf or in their
> stead, the state payment for the services shall be
> counted as state spending to units of local govern-
> ment. This subsection shall apply only if the de-
> partment of mental health has attempted to bar-
> gain in good faith with the board of county com-

munity mental health program for a full or shared management contract for the provision of the services described in this subsection, but has been unable to enter into such a contract with the board of the county community mental health program.

On December 17, 1985, plaintiffs filed suit, alleging that classifying state funds paid to state-owned and state-operated facilities for the care of mentally ill and developmentally disabled as state spending paid to units of local government violated Const 1963, art 9, § 30 and that MCL 18.1350(2); MSA 3.516(350)(2) was unconstitutional.

The circuit court held:

Care for the mentally ill is, and always has been, an activity or service *required of the State of Michigan by state law.* See MCL 330.1101 *et seq.* [MSA 14.800(101) *et seq.*] (Emphasis added.) This objective of "responsibility shifting" to the counties alluded to in MCL 330.1161(e)(ii) [MSA 14.800(161)(a)(ii)] does not discuss any future expectation of "expenditure shifting" to the counties as defendants submit. Certainly, had this been the Legislature's intent, such legislation would have been simultaneously enacted by the Management and Budget Department long before [§] 30 of the Headlee Amendment was implemented in 1978. Defendants' argument that this alleged guiding principle of the Mental Health Code (shifting responsibility to the counties) allows the state to characterize mental health service expenditures as "state spending paid to local units of government" is without merit.

The Court finds the state may not, through MCL 18.1350(2) [MSA 3.516(350)(2)], attribute to local units of government (e.g., Oakland County) that portion of state spending for county mental health services because of a county's refusal to accept responsibility *via* shared or full management contracts. To do so would violate Article 9, Section 30

of the 1963 Michigan Constitution. The Legislature cannot repeal a constitutional mandate of the people. [Emphasis in original.]

On appeal, defendants argue that the state funds should be treated as state funds paid to local units of government, relying on OAG, 1982, No 6022, *supra.* Defendants also argue that Const 1963, art 9, § 30 is satisfied if 41.61 percent of the total annual state spending is paid to all units of local government taken as a group, even if the particular budgetary items included within that percentage were not characterized as state spending paid to local units of government in 1978, citing *Durant, supra,* pp 392-393.

On the other hand, plaintiffs argue that the state is merely discharging its obligation to provide services to the mentally ill and developmentally disabled by having the counties deliver these services. Plaintiffs note the extensive regulation of community mental health boards as well as the substantial state funding provided. MCL 330.1201 *et seq.* and 330.1308; MSA 14.800(201) *et seq.* and 14.800(308). Plaintiffs also note that, where the county does not opt to provide such services, the state must. Plaintiffs, like amicus curiae, also argue that the programs originally included in establishing the 41.61 percent level of state funding to local units of government suffer when the state is allowed to treat what was initially a departmental transfer as state spending to local units of government. In turn, plaintiffs argue that the counties will be required to increase their taxes to make up for the declining aid to the programs originally included in establishing the 41.61·percent level of state funding to local units of government.

We agree with plaintiffs and the trial court that the provision of mental health care services is a

state obligation for the reasons advanced by plain-
tiffs. Hence, we agree that the state money even
though technically paid to a local unit of govern-
ment remains state spending because the county is
merely discharging the state's obligation.

Finally, defendants claim that the circuit court
erred when it held MCL 18.1350(2); MSA
3.516(350)(2) unconstitutional. We note that MCL
330.1116(e)(ii); MSA 14.800(116)(e)(ii) merely al-
lowed counties to assume responsibility for deliv-
ery of mental health services if they desired to do
so and had demonstrated the capacity to provide
an adequate and appropriate system of mental
health services. Where the county failed to do so,
the state was still responsible for providing those
services. MCL 330.1116; MSA 14.800(116). Hence,
the state funds expended for such purposes re-
mained state funds and could not be treated as
state funds paid to local units of government.

Affirmed.

GRIFFIN, J., concurred.

SULLIVAN, J. *(dissenting)* I dissent.

As the Attorney General argues, there is noth-
ing in Const 1963, art 9, § 30 which prevents the
Legislature from making offers to local units of
government to assume control of previously state-
run programs and providing funds to them to
carry out such program.

When such offers are accepted and local units of
government assume control of the offered program
along with the funds, however, the result must be
that the funds are considered local government
spending within the contemplation of Const 1963,
art 9, § 30.

As the Attorney General points out, while not interpreting Const 1963, art 9, § 30, the opinion of the Court of Appeals in the case of *Monticello House, Inc v Calhoun Co,* 20 Mich App 169; 173 NW2d 759 (1969), supported the conclusion that the funds in question are, in fact, expenditures for local units of government once the county community mental health boards agree to accept responsibility. In determining when state funds lose their identities and become county funds, the Court stated:

> In a project of this nature, admittedly there is some state reimbursement. *However, it appears that these funds are actually county moneys.* Although there is no Michigan authority on this point, the Ohio case of *State v Lucas* (1949), 39 Ohio Op 519 (85 NE2d 155), holds that *state funds appropriated and paid to a county lose their identity as state funds upon being paid to that county.* The reason expressed in *Lucas* applies to the situation before us:
>
> "Political subdivisions of the state are entitled to a share of many funds collected by the state for express purposes, such as the gasoline fund, auto tax fund, sales tax fund, school fund, and others, all of which by express direction of the law must be used by the counties and other political subdivisions for the purposes provided by statute. It would not be contended that any of such funds, after payment thereof to the political subdivisions, are still state funds, although collected and distributed by the state, although, under the provisions of the various statutes, such funds may only be legally used for specified purposes." [Emphasis added, 20 Mich App 173.]

I would therefore reverse.