## MASON COUNTY v DEPARTMENT OF COMMUNITY HEALTH

Docket No. 295365. Submitted May 4, 2011, at Detroit. Decided August 2, 2011, at 9:10 a.m. Leave to appeal denied, 490 Mich 1005.

Mason and Oceana Counties brought a declaratory action in the Mason Circuit Court, seeking a judgment declaring that neither plaintiff was able to control or substantially influence defendant West Michigan Community Mental Health System (WMCMHS) and, therefore, building leases that the counties held with WMCMHS were the result of arm's-length transactions, that WMCMHS had a legal obligation to make rental payments, and that WMCMHS had the right to use state funds and local matching funds for the payments. WMCMHS and the state defendants (the Department of Community Health [DCH], the Director of the DCH, and others) were parties to a services contract. The action arose after the DCH issued reimbursement guidelines stating that expenditures by community mental health authorities, such as WMCMHS, had to comply with certain provisions in Office of Management and Budget (OMB) Circular A-87 concerning less-than-arm's-length transactions. As a result of the new guidelines, WMCMHS began withholding rent payments from plaintiffs, believing that they had engaged in less-than-arm's-length transactions. The state defendants moved for summary disposition. The court, Richard I. Cooper, J., denied the motion. The state defendants then filed a second motion for summary disposition and plaintiffs filed their own motion for summary disposition. The court granted plaintiffs' motion for summary disposition, concluding that the leases were the result of arm's-length transactions, that the court had subject-matter jurisdiction over the action, and that the Centers for Medicare and Medicaid Services, the federal agency that oversees Medicaid, was not a necessary party to the action. The state defendants appealed.

The Court of Appeals *held*:

1. The Court of Claims has exclusive jurisdiction over all claims and demands, liquidated and unliquidated, ex contractu and ex delicto, against the state and any of its departments, commissions, boards, institutions, arms, or agencies. This includes declaratory claims against the state which involve contract or tort

without more, even when money damages are not sought. Plaintiffs' underlying claim was for breach of contract against WMCMHS. That breach occurred as the result of WMCMHS's contract with the state defendants, but plaintiffs were not parties to that contract and, therefore, could not seek a declaratory ruling regarding that contract in the Court of Claims. Although the Court of Claims might have had concurrent jurisdiction over the action because it was ancillary to a state contract, the circuit court at least retained its own concurrent jurisdiction.

2. Under OMB Circular A-87, a less-than-arm's-length transaction is one under which one party to a lease agreement is able to control or substantially influence the actions of the other. Under 1995 PA 290, counties do not have the ability to control or substantially influence community mental health authorities given that such authorities are separate governmental entities, have their own boards to set policies and procedures, and have numerous independent powers and duties. Moreover, under the act, a county's involvement in a community mental health authority is limited to appointing board members, reviewing documents, and approving the county portion of the budget of the authority. This level of involvement does not constitute control or substantial influence. The trial court properly concluded that the plaintiffs did not control WMCMHS, and thus that those parties' leases were arm's-length transactions.

3. Plaintiffs were not unjustly enriched by the rent payments given that WMCMHS and plaintiffs were separate legal entities and WMCMHS did not own the buildings at issue.

4. Under MCR 2.205(A), parties must be joined if their presence in the action is essential to permit the court to render complete relief. Although WMCMHS might have sought federal dollars to pay the back-due rent, WMCMHS had not yet sought additional payment by the Centers for Medicare and Medicaid Services. Accordingly, that agency's presence was not required in the legal proceedings.

Affirmed.

MENTAL HEALTH — MENTAL HEALTH CODE — COMMUNITY MENTAL HEALTH AUTHORITIES — RELATIONSHIP WITH COUNTY GOVERNMENT — ARM'S-LENGTH TRANSACTIONS — CONTROL OR SUBSTANTIAL INFLUENCE.

Counties do not have the ability to control or substantially influence community mental health authorities given that such authorities are separate governmental entities, have their own boards to set policies and procedures, and have numerous independent powers and duties; under the Mental Health Code, a county's involvement

in a community mental health authority is limited to appointing board members, reviewing documents, and approving the county portion of the budget of the authority (MCL 330.1001 *et seq.*).

*Mika Meyers Beckett & Jones, PLC* (by *John H. Gretzinger*), for Mason and Oceana Counties.

*Bill Schuette*, Attorney General, *John J. Bursch*, Solicitor General, and *Darrin F. Fowler*, Assistant Attorney General, for the Department of Community Health, the Director of the Department of Community Health, and others.

*Cohl, Stoker & Toskey, P.C.* (by *Timothy M. Perrone*), for the West Michigan Community Mental Health System and Richard VandenHeuvel.

Before: SAAD, P.J., and JANSEN and K. F. KELLY, JJ.

PER CURIAM. The state defendants[1] appeal as of right the trial court's order granting summary disposition and declaratory relief to plaintiffs Mason County and Oceana County (hereinafter county plaintiffs). The appeal requires us to consider the statutory relationship between a community mental health (CMH) authority, a county, and the state Department of Community Health (DCH). The trial court concluded that defendant West Michigan Community Mental Health System (WMCMHS), a CMH authority, and county plaintiffs were engaged in an arms-length transaction because under statute county plaintiffs did not have the ability to control or significantly influence WMCMHS. As a

---

[1] The state defendants, the Department of Community Health, the Director of the Department of Community Health, the Director of Community Mental Health Services Bureau, and the Director of the Program Development Consultations and Contracts Division, in their capacity as defendants in this suit, will be referred to simply as "defendants."

result, the trial court awarded county plaintiffs declaratory relief and concluded that they were owed rent under their contract with WMCMHS. We agree and affirm.

## I. BASIC FACTS AND PROCEDURAL BACKGROUND

This case concerns whether WMCMHS can breach contracts to pay rent to plaintiffs as a result of its contract with defendant DCH. WMCMHS is a CMH authority created in 1997 by Mason, Oceana, and Lake Counties under the procedures outlined in the Mental Health Code, MCL 330.1001 *et seq*. Defendant DCH is the state agency that oversees and funds health-related services in the state of Michigan. In particular, it is the state agency that receives federal Medicaid money and disburses that money to healthcare providers throughout the state, including WMCMHS. WMCMHS and defendants are parties to a services contract that requires WMCMHS to "maintain all pertinent financial and accounting records," using the Office of Management and Budget (OMB) Circular A-87 to determine all costs.

WMCMHS is housed in two buildings owned by county plaintiffs: Mason County's Madden Building and Oceana County's Lincoln Street Building. The Madden Building was built in 1987 and was paid for through bonds retired by using federal and state funds. The original rental contract was a sublease agreement between Mason County and its department of mental health board in effect from 1987 to 2003. Oceana County's Lincoln Street Building was purchased in 1987 by Oceana County for mental health services at that time administered by its department of community mental health services. Oceana County and its department entered into a 10-year lease.

When it was created in 1997, WMCMHS assumed the lease agreements with both Oceana and Mason counties for the Madden Building and the Lincoln Street Building. In 2003, WMCMHS and Mason County renegotiated the Madden Building lease for a 10-year period, requiring annual rent of $100,000, payable in semiannual installments. In 2005, Oceana County and WMCMHS agreed to a one-year extension of the Lincoln Street Building lease, which provided for monthly payments of $3,125.

In November 2006, defendant DCH issued guidelines in which it stated that mental health authorities' expenditures must comply with the provisions in OMB Circular A-87 concerning less-than-arm's-length transactions. OMB Circular A-87 states:

> Rental costs under "less-than-arms-length" leases are allowable only up to the amount (as explained in Attachment B, section 37.b) that would be allowed had title to the property vested in the governmental unit. For this purpose, *a less-than-arms-length lease is one under which one party to the lease agreement is able to control or substantially influence the actions of the other.* Such leases include, but are not limited to those between (i) divisions of a governmental unit; (ii) governmental units under common control through common officers, directors, or members; and (iii) a governmental unit and a director, trustee, officer, or key employee of the governmental unit or his immediate family, either directly or through corporations, trusts, or similar arrangements in which they hold a controlling interest. For example, a governmental unit may establish a separate corporation for the sole purpose of owning property and leasing it back to the governmental unit. [OMB Circular A-87, Attachment B, § 37(c) (emphasis added).]

As a result, defendant DCH indicated that it would only use Medicaid monies to reimburse actual costs for health authorities engaged in less-than-arm's-length transactions with local governments. In 2006, aware of

defendants' position on the rental of county-owned buildings and believing that it had engaged in less-than-arm's-length transactions with plaintiffs, WMCMHS decided to withhold rent payments from county plaintiffs.

Plaintiffs brought this declaratory action in the Mason Circuit Court in July 2008, seeking a judgment declaring that neither Mason County nor Oceana County was able to control or substantially influence WMCMHS and, therefore, the leases they held were arm's-length transactions for which WMCMHS had a legal obligation to make rental payments. They further sought a declaration that WMCMHS had the legal right to use state funds and local matching funds for the leases.

Defendants moved for summary disposition, arguing that they had sovereign immunity, that plaintiffs had failed to state a cause of action against them and therefore the trial court lacked jurisdiction, and that plaintiffs lacked standing to challenge any contractual disputes arising between defendants and WMCMHS because they were not parties to the contract. WMCMHS responded in opposition, arguing that the true nature of the action was the interrelationship of its lease contracts with plaintiffs and its service contract with defendants. Plaintiffs concurred in these conclusions, asserting the lease amounts were not in dispute and were at or below fair market value. The real question concerned the legal relationship between plaintiffs, defendants, and WMCMHS.

The trial court denied defendants' motion, finding it had jurisdiction because Lake and Mason Counties were within its geographical jurisdiction and the rights and responsibilities regarding buildings owned by plaintiffs were in dispute. Although most of the funding at issue

came from federal sources, the court concluded that that did not deprive the state court of jurisdiction. The trial court also found that plaintiffs had standing because they had an interest in the contract WMCMHS had with the state. Complying with defendants' guidelines concerning OMB Circular A-87 made it impossible for WMCMHS to fulfill its contract with plaintiffs.

In August 2009, defendants filed a second motion for summary disposition and plaintiffs filed their own motion for summary disposition. Defendants argued for the first time that jurisdiction was only proper in the Court of Claims because plaintiffs sought an interpretation of a state contract and indirectly brought a claim for money damages against the state. Defendants also reargued that plaintiffs lacked standing; that plaintiffs illegally failed to transfer the county-owned buildings to WMCMHS upon its creation, as required by MCL 330.1205(3)(a); that the leases were not arm's-length transactions; that Oceana County was estopped from receiving rent payments because of representations it made to the state in order to receive state financing for renovations of the Lincoln Building; and that Mason County should not receive rental income from WMCMHS because such income amounted to unjust enrichment given the state money used to finance the Madden Building. Finally, defendants also argued for the first time that the Centers for Medicare and Medicaid Services (CMS), the federal agency that oversees Medicaid, was a required party to the lawsuit because federal money was implicated. Plaintiffs argued in their summary disposition motion that there was no question of fact that they did not control WMCMHS and that the evidence showed the leases were negotiated at arm's-length and were at or below fair market rates.

The trial court granted plaintiffs' motion for summary disposition. The trial court found plaintiffs had standing because defendants' policy meant plaintiffs were no longer getting their rent payments. The court also found that jurisdiction was proper because the issues involved local entities more than the state. It concluded that plaintiffs' mere ability to create the mental health authority board did not amount to control and that there were numerous other appointed bodies that were not controlled by the appointing authority. The court also held that MCL 330.1224 did not allow at-will removal of board members. Thus, the court found that the leases were arm's-length transactions.

The trial court briefly addressed the other issues, finding that CMS did not need to be joined, that plaintiffs were not required to transfer the buildings to WMCMHS because the buildings were not assets of the county agency, and that plaintiffs were not unjustly enriched by receiving rents because the counties remained separate from the mental health authority.

Defendants objected to plaintiffs' proposed order, and a hearing was held on their objections. The proposed order included not only a declaration that WMCMHS and plaintiffs had an arm's-length relationship in their lease agreements, but also that WMCMHS is legally obligated to pay the accumulated lease payment to both counties and that defendants could not declare the lease payments between the counties and WMCMHS ineligible for funding. Defendants objected to the implicit ruling that plaintiffs were "absolutely entitled to the reimbursement for these rents" in addition to a ruling that these were arm's-length transactions. WMCMHS agreed with this position and argued that the court should not declare that WMCMHS had an ongoing

responsibility to pay the rent. Defendants proposed an order that held that plaintiffs and WMCMHS have an arm's-length relationship, that CMS did not need to be joined, and that plaintiffs were not obligated to transfer ownership of the buildings to WMCMHS when they created that entity.

At a hearing on defendants' objections, the trial court ruled that the rent was owed and that the dollar amount was uncontested. Therefore, plaintiffs had a right to protect the amount owed through the creation of an escrow account or by defendants' posting a bond. The order that the trial court ultimately entered found that plaintiffs did not have the ability to control or substantially influence WMCMHS and that the leases between plaintiffs and WMCMHS were not less-than-arm's-length transactions. The court also found that WMCMHS had a legal obligation to pay the past-due rent and future rents due under the leases "unless there is a substantial or material change in circumstances that applies in the future[.]" The court held that WMCMHS "has the legal right to use Federal Medicaid, State general and local matching funds" to make the lease payments. In addition, the court held that plaintiffs were not required to transfer their buildings to WMCMHS, that the Court of Claims did not have exclusive jurisdiction, that plaintiffs did not lack standing, that CMS was not a necessary party, that the order was stayed pending appeal, and that WMCMHS had to "take actions" to escrow the amounts due under the leases or, alternatively, to post a bond to ensure payment. Defendants now appeal.

## II. JURISDICTION

Defendants argue that the Court of Claims had exclusive jurisdiction over plaintiffs' claims and, as a

result, the trial court lacked subject-matter jurisdiction to issue its order. We disagree. Whether a circuit court has jurisdiction over a particular case is a question of law subject to review de novo. *Sierra Club Mackinac Chapter v Dep't of Environmental Quality*, 277 Mich App 531, 544; 747 NW2d 321 (2008).

Under the Michigan Constitution, the circuit court has "original jurisdiction in all matters not prohibited by law[.]" Const 1963, art 6, § 13; see also *Lapeer Co Clerk v Lapeer Circuit Judges*, 465 Mich 559, 568; 640 NW2d 567 (2002). The Court of Claims has exclusive jurisdiction over "all claims and demands, liquidated and unliquidated, ex contractu and ex delicto, against the state and any of its departments, commissions, boards, institutions, arms, or agencies." MCL 600.6419(1)(a). This includes declaratory claims "against the state that involve contract or tort without more," even when money damages are not sought. *Parkwood Ltd Dividend Housing Ass'n v State Housing Dev Auth*, 468 Mich 763, 773; 664 NW2d 185 (2003).

> Thus, the Court of Claims, while having exclusive jurisdiction over complaints based on contract or tort that seek solely declaratory relief against the state, also has concurrent jurisdiction [with the circuit court] over complaints seeking declaratory and equitable relief not based on tort or contract if ancillary to a contract or tort claim. [*Duncan v Michigan*, 284 Mich App 246, 286-287; 774 NW2d 89 (2009), vacated in part on other grounds and aff'd in part 486 Mich 906, vacated 486 Mich 1071, reinstated 488 Mich 957 (2010).]

In this case, plaintiffs' underlying claim is one for breach of contract against WMCMHS. That breach of the contract between plaintiffs and WMCMHS occurred as a result of WMCMHS's contract with defendants. Not being parties to the contract between defendants and WMCMHS, however, plaintiffs have no rights un-

der that contract and could not seek a declaratory ruling regarding the contract with the state at the Court of Claims. Although defendants tried to pose this as a suit by plaintiffs for tortious interference with a contract, such a suit would have no basis if, in fact, defendants were correctly interpreting the statutes and OMB Circular A-87. Thus, there is only one possible underlying action: a simple breach of contract between two parties, plaintiffs and WMCMHS, neither of which is a state agency. At best, then, the Court of Claims would have concurrent jurisdiction over the action because it is ancillary to a state contract. *Id.* Still, the circuit court would retain concurrent jurisdiction, and, accordingly, the trial court did not err by concluding that it had subject-matter jurisdiction.

### III. ARM'S-LENGTH TRANSACTION

Defendants' next assertion on appeal is that the trial court erred by concluding that under the Mental Health Code plaintiffs did not have the ability to control WMCMHS and, as a result, an arm's-length transaction existed between plaintiffs and WMCMHS. We disagree.

### A. STANDARD OF REVIEW

Statutory interpretation is a question of law that we consider de novo on appeal. *Detroit v Ambassador Bridge Co*, 481 Mich 29, 35; 748 NW2d 221 (2008). We review for clear error the trial court's factual findings. MCR 2.613(C); *Pine Bluffs Area Prop Owners Ass'n, Inc v DeWitt Landing & Dock Ass'n*, 287 Mich App 690, 711; 792 NW2d 18 (2010).

The primary goal when interpreting statutes is "to give effect to the intent of the Legislature." *Nastal v Henderson & Assoc Investigations, Inc*, 471 Mich 712,

720; 691 NW2d 1 (2005). We give the words of the statute their common and ordinary meanings, and if the language is clear, we presume that "the Legislature intended the meaning it clearly expressed and further construction is neither required nor permitted." *Id.* To make effective the Legislature's intent through statutory construction, the changes in an act must be construed in light of the act's predecessor statutes and the law's historical development. *Advanta Nat'l Bank v McClarty*, 257 Mich App 113, 120; 667 NW2d 880 (2003).

### B. STATUTORY HISTORY

Before addressing the merits of defendants' argument, we first examine the historical development of the Mental Health Code and the changes in the provision of mental health services made in 1995. The Michigan Constitution requires the Legislature to pass "suitable laws for the protection and promotion of the public health." Const 1963, art 4, § 51. Through that grant of power, the Legislature codified the Mental Health Code. Section 116(e) of 1974 PA 258 directed that the Department of Mental Health (DMH) do the following:[2]

> (i) It shall administer the provisions of chapter 2 so as to promote and maintain an adequate and appropriate system of county community mental health services throughout the state.

> (ii) In the administration of chapter 2, it shall be the objective of the department to shift from the state to a county the primary responsibility for the direct delivery of public mental health services whenever such county shall

---

[2] Before 1996, the Department of Community Health was the Department of Mental Health. See MCL 330.3101 (Executive Reorganization Order No. 1996-1).

have demonstrated a willingness and capacity to provide an adequate and appropriate system of mental health services for the citizens of such county.

In 1995, the Legislature amended the Mental Health Code. 1995 PA 290. At that time, the Legislature assigned DCH responsibility for providing mental health services to residents of the state of Michigan. See MCL 330.1116(1) and (2)(a). However, in MCL 330.1116(2)(b), the Legislature directed DCH

to shift primary responsibility for the direct delivery of public mental health services from the state to a community mental health services program [CMHSP] whenever the [CMHSP] has demonstrated a willingness and capacity to provide an adequate and appropriate system of mental health services for the citizens of that service area

in accordance with chapter 2 of the Mental Health Code, MCL 330.1200 *et seq.*

In sum, according to the language of the statutes, the goal as of 1974 was to shift responsibility for mental health services from the state to the counties, whereas in 1995 the goal became to shift the state's responsibility to CMHSPs. In other words, the state has always retained primary responsibility for mental health services, but the objective since 1974 has been to shift responsibility to localities and, in 1995, the local entity changed from counties to CMHSPs.

When the Mental Health Code was enacted in 1974, counties delivered mental health services through "county community mental health programs." 1974 PA 258, § 200 *et seq.* These entities should not be confused with CMHSPs, which came into being under 1995 PA 290 and will be further discussed later in this opinion. With respect to the 1974 county community mental health programs, § 210 of 1974 PA 258 provided that a single county or combination of adjoining counties

could elect to establish a county community mental health program by a majority vote of each county's board of commissioners. Section 204 provided that a county community mental health program would be "an official county agency." 1974 PA 258, § 204. Section 212 provided for the establishment of a 12-member county community mental health board, to be appointed by the county board of commissioners. *Id.* at § 212. The county community mental health board could not have more than four county commissioners unless the county community mental health board was made up of more than four counties, at which point the number of county commissioners could equal the number of counties and the 12-person board would increase in size to accommodate the extra appointments. *Id.* at § 222. A county board of commissioners could remove a county community mental health board member for neglect of official duty or misconduct in office. *Id.* at § 224. The county board of commissioners would approve the county community mental health board's annual plan and budget before it was sent to the DMH, and the county community mental health board would submit annual requests for county funds to the county board of commissioners. *Id.* at § 226(c) and (e). The county was responsible for 10 percent of the net costs for services "provided by [DMH], directly or by contract, to a resident of that county." *Id.* at § 302. Subject to certain qualifications, DMH was responsible for 90 percent of the annual net cost of a county community mental health program. *Id.* at § 308.

With regard to the CMHSPs created under 1995 PA 290, § 204(1) of the act, MCL 330.1204(1), provides as follows:

> A community mental health services program established under this chapter shall be a county community

mental health agency, a community mental health organization, or a community mental health authority. A county community mental health agency is an official county agency. A community mental health organization or *a community mental health authority is a public governmental entity separate from the county or counties that establish it.* [Emphasis added.]

MCL 330.1100a(18) defines a "county community mental health agency" as

an *official county or multicounty agency* created under [MCL 330.1210] that operates as a community mental health services program and that has not elected to become a community mental health authority under [MCL 330.1205] or a community mental health organization under the urban cooperation act of 1967, 1967 (Ex Sess) PA 7, MCL 124.501 to 124.512. [Emphasis added.]

A "community mental health organization" is "a community mental health services program that is organized under the urban cooperation act of 1967 . . . ."[3] MCL 330.1100a(15). Finally, a "community mental health authority" is "a separate legal public governmental entity created under [MCL 330.1205] to operate as a community mental health services program." MCL 330.1100a(14).

To understand why the Legislature altered the provision of mental health services and created CMHSP, we must then examine the legislative history of Senate Bill 525, which was enacted by 1995 PA 290. In *Kinder*

---

[3] Section 4 of the Urban Cooperation Act, MCL 124.501 *et seq.*, provides:

A public agency of this state may exercise jointly with any other public agency of this state, with a public agency of any other state of the United States, with a public agency of Canada, or with any public agency of the United States government any power, privilege, or authority that the agencies share in common and that each might exercise separately. [MCL 124.504.]

*Morgan Mich, LLC v City of Jackson*, 277 Mich App
159, 170; 744 NW2d 184 (2007), this Court noted that

> legislative analyses are "generally unpersuasive tool[s] of
> statutory construction." *Frank W Lynch & Co v Flex
> Technologies, Inc*, 463 Mich 578, 587; 624 NW2d 180
> (2001). This is because legislative analyses are prepared by
> House and Senate staff members and do not necessarily
> represent the views of any individual legislator. *Id*. at 588 n
> 7. "Nevertheless, '[c]ourts may look to the legislative
> history of an act, as well as to the history of the time during
> which the act was passed, to ascertain the reason for the
> act and the meaning of its provisions.' " *Twentieth Century
> Fox Home Entertainment, Inc v Dep't of Treasury*, 270 Mich
> App 539, 546; 716 NW2d 598 (2006) (citation omitted).
> Indeed, legislative bill analyses do have probative value in
> certain, limited circumstances. See *North Ottawa Commu-
> nity Hosp v Kieft*, 457 Mich 394, 406 n 12; 578 NW2d 267
> (1998); *Kern v Blethen-Coluni*, 240 Mich App 333, 338 n 1;
> 612 NW2d 838 (2000); *Seaton v Wayne Co Prosecutor*, 233
> Mich App 313, 321 n 3; 590 NW2d 598 (1998). [Alterations
> in original.]

House Legislative Analysis, SB 525, February 9, 1996
(hereinafter Bill Analysis) addresses this bill.[4] It notes
that the bill was intended, in pertinent part, to amend
the Mental Health Code to require a shift of primary
responsibility for mental health services from the state
to CMHSPs rather than from the state to counties.[5] Bill
Analysis, pp 1, 7. Consistent with the definition of
"community mental health authority" found in MCL

---

[4] The bill was also addressed in an earlier analysis by the Senate Fiscal
Agency. Senate Fiscal Agency Analysis, SB 525, June 14, 1995. That
analysis provides no additional insights. It is noted that when the Senate
Fiscal Agency analysis was preformed, the community mental health
authorities were referred to as community mental health entities in the
proposed legislation.

[5] While the Bill Analysis indicates that this was a *required* shift from
counties to CMHSPs, the "county community mental health agency" that
is one of the three recognized CMHSPs, MCL 330.1204(1), is an "official

330.1100a(14), the analysis indicated that "[A] community mental health organization or a community mental health authority would be a public governmental entity separate from the county or counties that established it." *Id.* at 8.

In the first section of the analysis discussing arguments for the bill, it is noted that the changes were intended "to provide more flexibility and authority for the locally-based CMH system" and that the amended code would see CMHSPs "as a single-entry point to access mental health services . . . ." *Id.* at 35. In the second section discussing arguments for the bill, it is noted that "[p]erhaps the most significant aspect of the bill is that direct delivery of mental health services would be shifted from the county CMH to a new entity, the CMHSP." *Id.* at 36. In the first section discussing arguments against the bill, *id.* at 37, it is noted that there were concerns with the fact that governmental immunity was being extended to the employees and board members of CMH authorities. In this context, the analysis stated:

> [U]nlike a CMHSP agency in which an elected body of officers (the county board of commissioners) is closely involved by developing policies and procedures and exercising budgetary and other controls, an authority would be a separate entity from the county and would be virtually untouchable even by the commissioners who vote it into existence. For instance, the commissioners would have to ask to see a copy of the authority's budget, and then only for informational purposes. Other than dissolving an authority, a county board of commissioners would have little if no input into the delivery of services to the mentally ill and developmentally disabled population of the area served by the authority. [*Id.*]

county or multicounty agency," MCL 330.1100a(18). Thus, while referred to as a CMHSP, it appears that a county could elect to retain control by choosing this form of CMHSP.

The analysis indicates that a CMH authority was intended to be largely autonomous from the governing body of the county.

### C. ANALYSIS

Defendants contend that pursuant to the Mental Health Code, plaintiffs have the ability to control or substantially influence WMCMHS and, therefore, there was no arm's-length transaction between plaintiffs and WMCMHS. According to defendants, plaintiffs are granted through statute the ability to establish a mental health authority such as WMCMHS, to appoint all of WMCMHS's board members, to remove WMCMHS board members, to approve funding to support WMCMHS, and to dissolve WMCMHS. In fact, plaintiffs may appoint up to four of their county commissioners to WMCMHS's board. The trial court, in contrast, concluded that plaintiffs' ability under statute to create the authority and appoint members to the board did not amount to the ability to control or substantially influence and did not render the transaction less-than-arm's-length. We agree with the trial court.

As noted earlier in this opinion, OMB Circular A-87 provides the definition for a less-than-arm's-length transaction. A less-than-arm's-length lease "is one under which one party to the lease agreement is able to control or substantially influence the actions of the other." OMB Circular A-87, Attachment B, § 37(c). OMB Circular A-87 gives some examples of less-than-arm's length transactions including, but not limited to

(i) divisions of a governmental unit; (ii) governmental units under common control through common officers, directors, or members; and (iii) a governmental unit and a director, trustee, officer, or key employee of the governmental unit or his immediate family, either directly or through

corporations, trusts, or similar arrangements in which they hold a controlling interest. [*Id*.]

Other than these examples, OMB Circular A-87 does not define "control" or "influence." A common meaning of "control" is to "exercise restraint or direction over; dominate, regulate, or command; to hold in check; curb." *Webster's Universal College Dictionary* (1997).

While some provisions of 1995 PA 290 could be construed as indicating that a CMH authority is not autonomous from the county, the bulk of this act, consistent with the legislative analysis discussed above, indicates that autonomy was intended and counties do not have the ability to control or substantially influence a CMH authority. The act indicates that the authorities are, in essence, run independently from the counties. Moreover, the act indicates that the state, not counties, exerts control over CMHSPs, including the CMH authorities.

With regard to independence from the counties, as previously noted, the act provides that a CMH authority is "a public governmental entity separate from the county or counties that establish it." MCL 330.1204(1). Its board sets its policies and procedures. MCL 330.1204(2). It has numerous powers, MCL 330.1205(4)(f), including the power to, in its own name,

(*i*) Enter into contracts and agreements.

(*ii*) Employ staff.

(*iii*) Acquire, construct, manage, maintain, or operate buildings or improvements.

(*iv*) Subject to subdivision (e), acquire, own, operate, maintain, lease, or dispose of real or personal property . . . .

(*v*) Incur debts, liabilities, or obligations that do not constitute the debts, liabilities, or obligations of the creating county or counties.

> (*vi*) Commence litigation and defend itself in litigation. [MCL 330.1205(4)(f).]

Further, it can finance the purchase of real or tangible personal property, MCL 330.1205(10), and is "responsible for all executive administration, personnel administration, finance, accounting, and management information system functions." MCL 330.1205(5)(b). The county is "not liable for any intentional, negligent, or grossly negligent act or omission, for any financial affairs, or for any obligation of a [CMH] authority, its board, employees, representatives, or agents." MCL 330.1205(6). Moreover, an authority employee is not a county employee. MCL 330.1205(8).

The boards of CMHSPs, including CMH authorities, must, among other things:

> (a) Annually conduct a needs assessment to determine the mental health needs of the residents of the county or counties it represents and identify public and nonpublic services necessary to meet those needs. Information and data concerning the mental health needs of individuals with developmental disability, serious mental illness, and serious emotional disturbance shall be reported *to the department* in accordance with procedures and at a time established by the department, along with plans to meet identified needs. . . .
>
> (b) Annually review and submit *to the department* a needs assessment report, annual plan, and request for new funds for the community mental health services program. . . .
>
> (c) . . . In the case of a community mental health authority, provide a copy of its needs assessment, annual plan, and request for new funds *to the board of commissioners of each county creating the authority*.
>
> (d) Submit the needs assessment, annual plan, and request for new funds *to the department* by the date specified by the department. The submission constitutes

the community mental health services program's official application for new state funds.

\* \* \*

(f) Submit *to each board of commissioners* for their approval an annual request for *county* funds to support the program. . . .

(g) Annually approve the community mental health services program's operating budget for the year.

(h) Take those actions it considers necessary and appropriate to secure private, federal, and other public funds to help support the community mental health services program.

(i) Approve and authorize all contracts for the provision of services.

(j) Review and evaluate the quality, effectiveness, and efficiency of services being provided by the community mental health services program. The board shall identify specific performance criteria and standards to be used in the review and evaluation. These shall be in writing and available for public inspection upon request.

(k) . . . [A]ppoint an executive director of the community mental health services program who meets the standards of training and experience established by the department.

(*l*) Establish general policy guidelines within which the executive director shall execute the community mental health services program.

(m) Require the executive director to select a physician, a registered professional nurse with a specialty certification . . . or a licensed psychologist to advise the executive director on treatment issues. [MCL 330.1226(1) (emphasis added).]

This statute indicates that a county's involvement in the running of a CMH authority is limited to the receipt of a copy of reports, and the approval of the *county*

portion of the budget. We note that MCL 330.1226a allows a CMHSP board to create a special fund account to receive fees and third-party reimbursements, but only with approval of the board of county commissioners. However, reports regarding the funds are sent to DCH. *Id.*

Defendants argue that plaintiffs exert control through the appointment process. We conclude that the appointment process does not grant plaintiffs the ability to control or substantially influence. Although plaintiffs appoint all members of the board, no more than 4 of 12 board members can be county commissioners. MCL 330.1222(2). Other board members must be "representative of providers of mental health services, recipients or primary consumers of mental health services, agencies and occupations having a working involvement with mental health services, and the general public." MCL 333.1222(1). As a result, 2/3 of board members who are appointed by plaintiffs are interested in the provision of mental health services and have no loyalty to cause them to prefer plaintiffs over WMCMHS. The county commissioners operating in a dual role may, indeed, influence board decisions in favor of plaintiffs, but, without more, this cannot be said to amount to *substantial* influence. They lack a majority vote, but even more importantly, they have the duty and ethical obligation to act in the best interest of the CMH authority while performing in their capacity as CMH authority board members.

Defendants assert that plaintiffs have the ability to control because WMCMHS's board members can be removed by plaintiffs at will. We again disagree. The relevant sentence of the statute reads:

> A board member may be removed from office by the appointing board of commissioners or, if the board member was appointed by the chief executive officer of a county or a city under [MCL 330.1216], by the chief executive officer who appointed the member for *neglect of official duty or misconduct in office* after being given a written statement of reasons and an opportunity to be heard on the removal. [MCL 330.1224 (emphasis added).]

Defendants argue that the clause set off by commas severs the beginning of the sentence from the for-cause qualifier that follows and, as a result, plaintiffs have the ability to remove board members at will. Defendant's reading of the statute is without merit because it leaves "or" hanging without an explanation. Instead, the clause cited is an essential interrupting dependent clause that must be set off by commas. It interrupts the flow of the sentence to explain that the power of a chief executive officer (CEO) to remove a board member exists only when the CEO has appointed the member pursuant to MCL 330.1216. Thus, the sentence identifies two authorities with the power of removal, "the appointing board of commissioners" and the appointing CEO, and then, following the interrupting clause, identifies the grounds for which each authority may remove the member—"for neglect of official duty or misconduct in office after being given a written statement of reasons and an opportunity to be heard on the removal." Thus, whichever authority is involved, board members may only be removed for cause and after a hearing. Plaintiffs' authority to remove board members for cause only greatly reduces plaintiffs' ability to control or substantially influence WMCMHS.

Moreover, plaintiffs' capacity to dissolve WMCMHS under MCL 330.1205(2)(b) and MCL 330.1220 is also not a real or actual ability to control the board. As a practical matter, plaintiffs' mental health costs would greatly in-

crease if WMCMHS were to be dissolved.[6] Defendants are correct in stating that the proper test is not whether plaintiffs *actually* control the board but whether they have that *ability*. As the court stated in *Biloxi Regional Med Ctr v Bowen*, 835 F2d 345, 352 (D DC, 1987):

---

[6] Counties have a financial incentive to create a CMH authority. Under MCL 330.1302, counties are made financially liable for 10 percent of the net cost of services, except as otherwise provided in chapter 3 (and subsection (2), which is not pertinent here). Under MCL 330.1308(1) the state is made responsible for 90 percent of the annual net cost of a CMHSP. However, under MCL 330.1308(2), an exception to the local match requirement is carved out for CMH authorities:

> Beginning in the fiscal year after a [CMHSP] becomes a [CMH] authority under [MCL 330.1205], if the department increases the amount of state funds provided to [CMHSPs] for the fiscal year, all of the following apply:
>
> (a) *The amount of local match required of a [CMH] authority for that fiscal year shall not exceed the amount of funds provided by the [CMHSP] as local match in the year in which the program became a [CMH] authority.*
>
> (b) Subject to the constraint of funds actually appropriated by the county or county board of commissioners, *the amount of county match required of a county or counties that have created a [CMH] authority shall not exceed the amount of funds provided by the county or counties as county match in fiscal year 1994-1995 or the year the authority is created, whichever is greater.*
>
> (c) If the local match provided by the [CMHSP] is less than the level of local match provided in the year in which the [CMHSP] became a [CMH] authority, subdivision (a) does not apply.
>
> (d) The state is not obligated to provide additional state funds because of the limitation on local funding levels provided for in subdivisions (a) and (b). [Emphasis added.]

This indicates that there is a local match required of the CMH authority itself, as well as a local match required of the county. However, of import here is the fact that the local match for both entities is capped if a county elects to create an authority. Accordingly, if plaintiffs dissolve WMCMHS, the state through MDCH would have responsibility for providing mental health services in Mason, Oceana, and Lake Counties and plaintiffs would lose the financial liability cap incentive, or match limit, that they currently enjoy. Plaintiffs portion of the costs for providing mental health services would increase to 10 percent.

We realize, of course, that the District Court was properly concerned not with the actual but with the potential ability of the City to influence the Center. Indeed, the power of the sword of Damocles is not that it falls but that it hangs. Here, though, the power that the City has over the Center is more akin to the power that the butterknife of Damocles might have on those above whom it hangs. Realistically, if the City had any ability to influence the Center's actions or policies, it was not "significant."

In sum, the counties' involvement with CMH authorities is limited to appointing board members, reviewing documents, approving *county* funding, which covers a relatively small part of a CMH authority's budget, and having the power to dissolve a CMH authority. As previously noted, a county board of commissioners had very similar control over the appointment of members to county community mental health boards under 1974 PA 258. However, unlike CMH authorities, these community mental health programs were official county agencies. Moreover, the county boards of commissioners would approve the county community mental health board's annual plan and budget before it was sent to the DMH. By making a CMH authority "a public governmental entity separate from the county," and by taking away the county's responsibility for approving the annual plan and budget, it appears that, consistent with the legislative analysis, the intent of 1995 PA 290 was to substantially take away the control of county boards of commissioners.[7]

---

[7] Compare *Oakland Co v Dep't of Mental Health*, 178 Mich App 48, 59-60; 443 NW2d 805 (1989) (given that DMH was discharging its obligation to provide mental health services by having counties deliver them pursuant to 1975 PA 258, as evidenced in part by state controls, appropriations for mental health services were to the state even though paid to local units of government such that the Headlee Amendment, Const 1963, art 9, § 30, was not implicated).

Consistent with this conclusion, we note that the state exerts substantial control over CMHSPs, including CMH authorities. The state is required to financially support CMHSPs, including the authorities. MCL 330.1202; MCL 330.1240. The state can audit or call for an audit of a CMHSP. MCL 330.1244(d). The state reviews each CMHSP's "annual plan, needs ·assessment, request for funds, annual contract, and operating budget" and approves or disapproves state funding. MCL 330.1232; see also MCL 330.1234. Moreover, the state oversees the expenditures of CMHSPs, MCL 330.1236, and the state is responsible for certifying CMHSPs and can revoke certifications and cancel state funding, MCL 330.1232a(8) and (14)(a). That the counties do not have similar authority is a further indicator that they do not have the ability to control or substantially influence the board of a CMH authority. To conclude otherwise would appear to be a repudiation of the statutory scheme.

Further, we are not persuaded by defendants' argument that plaintiffs had actual control over WMCMHS. Larry VanSickle, who served as chairman of Oceana County's Board of Commissioners and as a member of WMCMHS's board, testified that he considered Oceana County's interests when he cast votes as part of the WMCMHS's board. Another board member recognized the potential influence of plaintiffs through the dual role of some county commissioners. Still, even considering the close relationship between WMCMHS's board members who were also county commissioners, plaintiffs did not have the ability to control or even substantially influence WMCMHS. As noted earlier, board members who were also county commissioners did not make up a majority of WMCMHS's board and, accordingly, did not have the ability to control or substantially influence. Moreover, all of WMCMHS's board members

owed a duty of loyalty to WMCMHS. As a result, plaintiffs and WMCMHS were engaged in an arm's-length transaction.

Finally, defendants contend that, even if there was an arm's-length relationship, plaintiffs were not entitled to rent payments because either they previously agreed not to accept rent payments from the county agencies that preceded WMCMHS or they accepted state financing for the building and would be unjustly enriched by rent payments from WMCMHS. In return for state financing for the Lincoln Street Building, Oceana County agreed in 1993 to tie future lease payments for the mental health agency to the costs connected with using the building and not more. Despite this agreement with the state, Oceana later demanded rent payments from WMCMHS that were greater than the costs to use the building. Similarly, the Madden Building was financed with state and federal money for the purpose of providing mental health services in Mason County. As a result, Mason County should not be entitled to rent payments. We disagree.

We conclude that plaintiffs were not unjustly enriched by the rent payments because WMCMHS and plaintiffs are separate legal entities, MCL 330.1204(1), and WMCMHS did not own the buildings at issue. When WMCMHS was created in 1997, plaintiffs had no obligation to transfer their buildings to WMCMHS. Under MCL 330.1205(3)(a), "[a]ll assets, debts, and obligations of the county community mental health agency or community mental health organization, including, but not limited to, equipment, furnishings, supplies, cash, and other personal property, shall be transferred to the [CMH] authority." However, at the time WMCMHS was created, the county agency did not hold title to either building, but merely leased them.

The leasehold was transferred, as required by statute. The Legislature certainly anticipated that county agencies, often housed in county-owned, state-and-federally-funded buildings, would stay in those facilities. It allowed mental health authorities to purchase real property and to be reimbursed for such purchases if carried out by lease-purchase arrangements. MCL 330.1242(a). There do not appear to be any inequities that would result from allowing the independent CMH authorities to continue to rent appropriate space from the counties at or below fair market rates.

For these reasons the trial court did not err by concluding that plaintiffs and WMCMHS were engaged in an arm's-length transaction and that plaintiffs were entitled to rent payments.

### IV. NECESSARY PARTY

Defendants' final issue on appeal is that the trial court erred by failing to require plaintiffs to join CMS as a necessary party to the litigation. We disagree. The trial court's decision regarding joinder is reviewed for abuse of discretion. See *PT Today, Inc v Comm'r of the Office of Fin & Ins Servs*, 270 Mich App 110, 136; 715 NW2d 398 (2006). The trial court did not abuse its discretion if the outcome of its decision is within the range of principled outcomes. *Taylor v Currie*, 277 Mich App 85, 99; 743 NW2d 571 (2007).

Under MCR 2.205(A), persons must be joined if "their presence in the action is essential to permit the court to render complete relief . . . ." The purpose of the rule is to prevent the splitting of causes of action and to ensure that all parties having a real interest in the litigation are present. See *id.*; *Gordon Food Serv, Inc v Grand Rapids Material Handling Co*, 183 Mich App 241, 243; 454 NW2d 137 (1989).

While it is possible that WMCMHS could seek federal dollars to pay back-due rent, at this point it is unclear where exactly the money will come from. If the state continued to receive federal money without a deduction for the payments defendants refused to pay WMCMHS, then it would be state dollars that would fund plaintiffs' shortfall. On the other hand, if the state continued to pay WMCMHS the same amount but only prohibited the funds' use for rent, WMCMHS can only look to itself for the source of the money. Until additional payment by CMS is sought either administratively or through further litigation, there is nothing requiring the presence of that agency in the legal proceedings. The trial court did not abuse its discretion by not requiring CMS to be a party, especially given that none of the parties, nor CMS itself, requested that it be joined.

Affirmed.

SAAD, P.J., and JANSEN and K. F. KELLY, JJ., concurred.